Green, J.
The plaintiff in error was indicted for the murder of Peter Elrod, who was found on the Pine mountain, in White county, dead, with marks of violence, indicating that he had been murdered.
The State offered to prove by Meredith Baker that Elrod had told him at Sparta, the evening before the day on which he was missing, that he was going the next day to the Pine mountain to hunt a saltpetre cave. This evidence was objected to as being incompetent, but the objection was overruled and the evidence admitted. We think this evidence was properly admitted. It is part of the transaction; explains the reasons why Elrod was in the Pine mountain, and constitutes a fact in the cause. Elrod was at Sparta, then on his way to the Pine mountain, and said he was going there next day to hunt a salt-petre cave. This declaration, made, as it may be said, while on his way, and explaining the reason of his going, constitutes an important fact to elucidate the question of his death. But it was also proved by Patrick Potts, that “sometime in the winter before Elrod’s death, he had a conversation with Elrod about defendant and saltpetre dirt. Elrod had some dirt he said he had got from defendant, who said it came out of a cave that he had found in the Pine mountain while he was hunting. El-rod asked witness as to the quality of the dirt; witness thought it valuable. Elrod said he was going shortly with defendant to look for the cave. Witness saw Elrod after his return, who told him that he and defendant had been out on the mountain looking for the cave; that they *263 bad got bothered: it snowed while they were out; they had to lay out in an old waste cabin, ana he, Elrod, had to hold his horse all night. Elrod stated that they were going out shortly again. This last conversation was shortly before his death.”
We think the whole of this testimony inadmissible. It is a history, by Elrod, of a past transaction occurring long before the facts then under investigation happened. It had no connection with those facts, so as to establish its verity, but depended upon the credit.of Elrod alone for its truth, and is nothing better than mere hearsay. Not so the testimony of Baker. The truth of Elrod’s declaration to him is verified by the fact that he was missing from that day, and was afterwards found dead in the Pine mountain. Had Elrod been wholly unworthy of credit, still his declarations to Baker would be entitled to belief.
We think the court erred in admitting the testimony of Potts, but was correct in the admission of that of Baker. The court also erred in rendering judgment of death upon this finding of the jury. ' The jury do not find what degree of murder the defendant is guilty of. The act of 1829, ch. 23, sec. 3, enacting ,the penitentiary code, expressly requires that the jury, when they find a party guilty of murder, shall ascertain in their verdict, whether it be murder of the first or second degree. It is further provided, that if the party confess his guilt, the court shall, by empannelling a jury and the examination of testimony, determine the degree of the crime. This, therefore, cannot be dispensed with, and the court has no power to proceed to judgment, unless the degree of the crime be ascertained by the verdict of the jury. It is argued by the counsel for the State'that the words, “in the first degree,” which, in this indictment, are added to the usual common law' charge of murder, constitute this an indictment for murder in the first degree, and that when the jury say the defendant is guilty as charged, *264 they, m effect, by their verdict, ascertain the degree of , J , . . , . , the crime. . to this it may be answered, that the common law indictment for murder, is an indictment for murder in the first degree under the statute, and that no additional description of the killing, or of the temper with which the killing was done, or declaration of the degree of guilt, can make it more so. All else, therefore, beyond the common law charge, is mere surplus-age. A finding upon an indictment for murder, where the offence is charged at common law, that the defendant is guilty as charged, is as much a finding that he is guilty in the first degree, as though the indictment had contained the very words of the statute, descriptive of the grade of the offence of murder. In neither case would a general finding of guilty authorize a judgment, but the degree of guilt must be ascertained as prescribed in the statute.
Catron, Ch. J. concurred.
Peck, J.
The indictment charges the offence as at common law, that said Kirby, feloniously, wilfully and maliciously, did make an assault with a certain axe, &c. and then and there feloniously, wilfully and maliciously of his malice aforethought, with the axe aforesaid, the said Peter Elrod did kill and murder. In the recapitulation and conclusion it is charged that the said Kirby, of his malice, &c. the said Elrod did kill and murder “in manner and form aforesaid in the first degree.”
The jury returned a verdict of guilty in manner and form as charged in the bill of indictment. The judgment upon this finding is that the said Kirby be executed.
The finding does not justify the judgment. The words introduced in the latter part of the indictment are not referable to any previous description of the offence given in the first part, by which we must necessarily infer the crime of murder in the first degree. According to the statute, the manner of committing the offence con *265 stitutes the crime; it is impossible, from this record, to r , t,, ' suppose that the murder of Elrod was perpetrated by means of poison, by lying in wait, or by wilful, deliberate, malicious and premeditated killing; or that it was perpetrated in the attempt to commit any of the crimes enumerated in the 3d section of the act of 1829, ch. 23. As the offence of murder in the first degree must be brought, within the statute to justify the judgment of death, and as all other kinds of murder shall be deemed murder in the second degree, we have not in this record the means of distinguishing which of the two offences has been committed, and this, by the act, it is made the duty of the jury to find “in their verdict” specifying the degree of guilt. The finding is no more certain 'than if the defendant had confessed his guilt, in which case it is made indispensable to empannel a jury to find the degree of the crime. It is not shown in the record that the traverse jury were good and lawful men; they are called and sworn, but it is not shown that they were persons qualified to serve.
In latter times, in this court, I have stood alone in requiring strictness in the_proceedings on the criminal side of our courts. I will not say that I regret having been so often overruled. The country will regret it, and they have power to set the matter right. When the question on captions to indictments was raised, and it became convenient to overrule what Judge Haywood and myself had decided, the grounds on which it was done, and the authority to authorize the doing of it has barely been glanced at in some of the opinions. Records in cases long since determined, were produced and compared with those before us, and the judges doing it measured his science in criminal law by that standard, and held, no doubt, upon a principle purely republican, that all persons should stand upon the foot of equality; that others having been condemned under rules so relaxed, these should also share the same fate. For my part, I thought *266 love of, and repeet for, the constitution of my country, was a better test to prove the integrity of the judge, and I based myself upon it. The clause in the bill of rights, “that the right of trial by jury shall remaim inviolate,”' was omnipotent with me. This clause was put in the 'constitution as a limitation upon legislatures and judges, a landmark by which men should be safe in the journey of life from the besetments that might have been intruded upon them without the clause. With this clause, and it adhered to by the courts, where was the room to relax? The legislature could not fritter away this right of freemen, by giving us new rules' not in accordance' with the constitution. No sheriff who summoned the jury had it in his power to save the life of one man, and! destroy that of another, by his selection of a jury. .No! the clause was made for the time being, and was unalterable by legislative enactment, or by any rule of decision of this court; the provision points us to the law as it then stood, touching the trial by jury, and said, that right shall remain inviolate. Strange that we should stand up so close to the provisions which declare that no ex post facto law shall be made, or the writ of habeas corpus suspended, and so entirely lose sight of the other provision. Who is so dull as not to know, that the persons to be called as jurors, the calling of them, the place they were to come from, their selection and oath, make parts in the trial by jury; dispense with any one requisite and where will we stop?
■In England, in the time when Sydney and Russell were tried, the rules were all well enough, but the heat and ferment of the times relaxed the rules, the judge became untrue to his tj-ust, and men were destroyed. Our forefathers saw that, and wisely provided against it in our constitution. I should think I gave but a poor evidence of my integrity, to fume and rant about a violation of the constitution in a matter merely affecting a few dollars, and then be silent where a similar violation *267 affected liberty or life. I cannot do it; and, however much I may respect the opinions of others upon rules of property, depending upon opinions of judges upon statutes or common law, I have no compromise to make where my mind is fully satisfied upon the plain letter of the constitution. The point is expressly made, and I feel myself bound to repeat my opinion upon it.
The evidence of declarations or sayings of the deceased some time before the murder, were improperly received. It is supposed they form part of the res gesta; for myself I cannot take them in any such sense. El-rod may have formed a resolution to go into the mountain; he may have said that he intended that Kirby should accompany him. So far the evidence proves nothing done, though a mind to do the thing is expressed, yet that mind may have changed, or Kirby might refuse to go; it depended upon mere- contingency, and cannot be viewed in any other light than a simple declaration.— What Elrod says Kirby told him, Elrod, to induce him to go to the mountain is hearsay, a narrative not on oath. If Kirby and Elrod had been on their way together, and Elrod had told some one they had met where they were going, that might be taken as part of the thing doing, or res gesta, but that is not this case; it is not the evidence offered or any thing like it, the evidence on this point in the cause is inadmissible.
The judge in his charge to the jury should have directed them to the difference between murder in the first and murder in the second degree; as it was their business-to find from the facts the degree of guilt, their minds should have been enlightened on the subject that they might be able clearly to discriminate to which class of the offence their verdict would fix the degree of guilt. This was held in the case of Mitchell vs. The State, at the last term of this court, where the line of distinction is drawn by this court, and a rule given which is unerring in its application, to wit, that to constitute the *268 first offence the malice must be express, in the second it may be perpetrated under the influence of malice implied. The necessity of the judge drawing the distinction in his instructions, arises from the fact, that the charge in the indictment contains within itself two offences, either of which the prisoner may be convicted of, according as the evidence may justify; an error in the finding is of too serious consequence to the prisoner, for if found guilty of too much, it is death; if of the right crime, his life is saved; therefore, the judge should not leave to the jury the cljance of mistaking the one offence for the other. It were better to omit almost any other part ol the charge. In these cases for murder the judge may err as fatally for the prisoner by being negative, as by doing too much. For these several causes, in my opinion, the judgment should be reversed.
Judgment reversed.