CLAUDE W. NICHOLS

*v.*

STATE OF TENNESSEE

(*Nashville,* December Term, 1955)

SUPREME COURT OF TENNESSEE

Opinion filed April 5, 1956.

T. G. Pappas and William J. Peeler, Waverly, Pride Tomlinson, Jr., Columbia, William C. Sugg, Nashville, for plaintiff in error.

Knox Bigham, Assistant Attorney General, for the State, defendant in error.

MR. JUSTICE PREWITT delivered the opinion of the Court.

The plaintiff in error, Claude W. Nichols, will be hereafter referred to as the defendant, as designated in the trial court.

He was convicted of the unlawful killing of the deceased Sailer Anderson, the jury finding him guilty of murder in the first degree, with a sentence of 99 years in the State Prison.

Nichols was arrested on October 14, 1954, on a warrant charging him with the murder of William Sailer Anderson in October, 1953.

It is the contention of the State that on October 9, 1953, the deceased gave the defendant a written option to purchase a farm, restaurant and tourist courts which the deceased owned in Maury County, Tennessee, for the sum of $200,000 cash; that the defendant fraudulently changed the option into a deed whereby the deceased conveyed his property to the defendant in exchange for the conveyance to him of three separate pieces of property owned by the defendant in Davidson, Maury, and Bedford Counties, which were much less in value than the property of the deceased and which were heavily encumbered; that the option was changed into a deed by the defendant by removing the first page of the instrument and inserting another page, which had the effect of changing the instrument from an option to an absolute conveyance. It is further insisted by the State that after the execution of the option, a change was made by the defendant into an absolute conveyance, and that he killed the deceased so that he could carry out his fraudulent plan.

The body of the deceased, Anderson, was discovered

on October 13, 1953, in Kentucky Lake in Humphreys County, Tennessee, at what is known as Trotter's Landing. His car was found later on the same day, submerged in the lake, in about nine feet of water, near the point where his body was found—that is, out in the lake from the point where the ferry landed. Three separate unrecorded deeds signed by defendant and his wife, conveying the three parcels of real estate to the deceased, were found in the glove compartment of the car, along with a promissory note for $2,000, payable to the deceased, signed by the defendant and a memorandum of the transaction had between deceased and defendant.

Before the body of the deceased was buried, a bill was filed in the Chancery Court at Columbia by deceased's mother, seeking to set aside the conveyance by the deceased of his Maury County property to the defendant and wife, on the ground that at the time he executed the instrument he was mentally disturbed, and that the consideration was grossly inadequate. This bill was sustained by the Chancellor holding that said purported conveyance by deceased Anderson to Nichols was fraudulent. The Court of Appeals affirmed, *Anderson v. Nichols*, 39 Tenn. App. 503, 286 S.W.2d 96, this Court recently denied *certiorari*.

From the day of the discovery of his body, the mysterious death of Sailer Anderson, the real estate transaction with defendant has received wide spread publicity.

The trial below lasted a period of fourteen days and the jury, after having deliberated for over three hours, brought in a verdict of conviction.

Following the defendant's arrest he was indicted in Humphreys County jointly with one William Otho Farrington. On defendant's motion for a severance, he was

granted a separate trial on the ground that his co-defendant, Farrington, had signed a written statement, out of the presence of the defendant, in which Farrington stated that this defendant participated in the commission of the crime charged.

Defendant has filed numerous assignments of error in this Court, but these may well be grouped so that the following errors are insisted upon by the defendant:

He contends that the conviction is not supported by the evidence and that the preponderance of the evidence is against the verdict of the jury. It is further insisted that the court below erred in the admission and exclusion of certain testimony, and in permitting the State to reopen the case by introducing proof which should have been offered by the State as part of its case in chief.

Defendant further insists that he should be awarded a new trial because he was blamelessly deprived of the testimony of a material witness, who was under subpoena, but who failed to appear and testify.

The body of Anderson was found on October 13, 1953, but the defendant was not arrested until October, 1954. Between these two dates many investigations were made by representatives of the State, including the District Attorney General and special counsel.

The place where the body was found near Trotter's Landing was about 90 miles west of Nashville on U. S. Highway No. 70, which is the main highway between Nashville and Memphis. This place is also about 90 miles northwest of Columbia, and Trotter's Landing and Columbia are connected by hard surface highways.

The dead body of Anderson was found on Tuesday morning, October 13, 1953, about 6:30 A.M. at the end of a levee extending approximately a quarter of a mile

into the water, just south of the bridge that crosses the Tennessee River on Highway 70. A paved road runs the length of the levee and the original ferry landing was at the extreme end. There was a barrier across the paved road to prevent traffic from going to the end of the levee. From about July 7, 1953, to September 24, 1953, repairs were being made on the bridge on Highway 70, and the traffic was taken care of by a ferry in operation during that time. However, the ferry was not in operation at the time the body was found and in fact, not in operation after September 24, 1953.

The deceased resided in Memphis and was the owner of Brookwood Farm and Brookwood Restaurant in Maury County. The restaurant was located on a small tract of some two or three acres adjoining the farm of approximately 253 acres. It appears that the restaurant building was a very fine structure and elaborately and modernly equipped. Sometime in the middle of 1953 defendant learned that deceased's property was for sale, and became interested in acquiring it. Thereafter Nichols, the defendant, and his secretary of several years, Mrs. Jeanelle Brown, went to Memphis to see the deceased. Mrs. Brown testified that she heard Anderson say that he was disposing of his interests outside of Memphis. As a result of the conference in Memphis, it appears that Anderson agreed to go to Nashville for the purpose of further discussion. It seems that in September, 1953, Anderson did go to Nashville, and he and Nichols went to Columbia so that Nichols might see the Brookwood property.

It appears that Mrs. Brown and Otho Farrington, above referred to, and an employee of Nichols also, went

to Columbia and were present during part of the inspection of the Anderson property.

Mrs. Brown states that Nichols had told her and Farrington to make it appear to Anderson that Nichols was a man of considerable means. Farrington had been employed by Nichols for some 16 or 17 years as a carpenter, plumber, electrician, and as a man to whom Nichols looked to take care of his property.

After this visit to the Brookwood Farm and restaurant, Anderson returned to his home in Memphis, and the other three went back to Nashville to their respective homes.

Some two weeks before his death Anderson had declared to a sister that he wanted to sell his property for cash and had listed the Maury County property with real estate agents at a price of $200,000. Anderson further stated that he wanted to sell the property for cash and have all of his investments in Memphis. Anderson's mother was old and he felt that he needed to be in Memphis, and expressed the wish to numerous friends during the summer of 1953, to sell out for cash. About the 6th or 7th of October, 1953, Anderson stopped at the home of Mrs. S. T. Ingram in Camden, and told her that he was on his way from Memphis to Columbia, and he told Mrs. Ingram that he was going to sell his property to defendant for $200,000 cash. In this conversation with Mrs. Ingram he stated the bridge over the Tennessee River was open. It appears that Anderson made similar statements about his plans to sell his property to Milton Milner in Jackson on October 6th, and to a group of friends in Nashville on October 7th.

On Thursday, October 8, 1953, Anderson went to Maury County from Nashville, with defendant, Mrs.

Brown, and Farrington. According to Mrs. Brown's testimony, Nichols suggested they go by his Woodland Street property in Nashville, which the group did, then at Nichol's suggestion, they went by Shelbyville to look at some property there. From Shelbyville the group went to the Brookwood property, where it was again looked over by Nichols and the others. Mrs. Brown testified that before returning to Nashville, they stopped at an apartment house owned by Nichols in Columbia, but this witness testified that she and Anderson remained in the car while Nichols and Farrington went in.

On Saturday, October 10th, about 11:30 A.M. Anderson went to a poultry and egg dealer in Columbia, and purchased some dressed chickens and about 4:30 or 5:00 P.M. the same day he went by and picked them up. According to the State's observations, this is the last time that Anderson was ever seen alive.

The State's witness, Walton Walsh, testified that he was the assistant manager of the Newspaper Printing Corporation, district office in the City of Columbia. Receipt and distribution of newspapers required Walsh to be out at night and in the performance of his duties, he was in his car at an intersection on the Pulaski Pike, just outside of Columbia at 11:30 to 11:45 P.M. on Saturday, October 10th. This intersection was between Brookwood Farms and Columbia. Walsh states that as he waited at this point his light shined into a car going towards Columbia, and he could see that the driver of the car was Nichols. He states that he was only 12 or 15 feet away from the car and that he had known Nichols since childhood; and that there was somebody else in the car, but he could not tell who it was. It was shown that from this

point to where the body was found was a drive of about two hours and seven minutes.

Three persons, testifying for the State, who lived near Trotter's Landing and on the road leading in that direction, testified that they observed automobiles going toward Trotter's Landing shortly after 2:00 A. M. Sunday, October 11th. One witness stated she saw two cars going towards the landing at shortly before 3:00 A.M., and one witness stated she saw one car going towards the landing, but the State insists that it is quite possible that they came to the front of the house too late to see the other car. One of the witnesses testified that the car she saw resembled the defendant's car, and another testified that the car bore a Tennessee license number one, showing that it was registered in Davidson County.

A young lady, Miss Marjorie Turner, age about 18 years at the time of the trial, testified that about 1:45 A. M. Sunday, October 10, 1953, she and a young man drove to Trotter's Landing and parked near the end of the levee for about thirty minutes. She testified that two cars approached at a high rate of speed, and when these two cars came near where she and her boy friend were sitting, they stopped and turned off their headlights. She testified that the young man immediately turned his car around and started out with their lights on. Miss Turner states that they drove past the other two cars, which still had their lights off, and she states that Nichols was in the first car and Farrington was in the second one. She further states that she and her friend drove on and parked nearby. She testifies that in fifteen or twenty minutes the car in which she had seen Nichols passed them.

Miss Turner did not testify to the foregoing facts during the State's case in chief. It seems that after she

testified in chief, she disclosed the above testimony and explained her failure to give the above testimony by stating that embarrassment prevented her from testifying about being out so late with a boy.

The witness Walsh, above referred to, testified he saw Nichols outside the bus station in Columbia between 8:30 and 10:00 A. M. Sunday, October 11th, and sold him a newspaper.

Mrs. Brown testified that on Sunday, Nichols called her and told her that he had completed the deal for Brookwood. She went from Nashville to Columbia with him after lunch to look at the Brookwood property, and when they returned to Nashville, she asked him if he would not like to go to a picture show with her. He declined, stating that she could get out up town that he had to go to Humphreys County.

That same Sunday afternoon, around 5:30 or 6:00 o'clock Nichols was seen at the Lakeview Cafeteria near Trotter's Landing by three people, one of them being the proprietor of the place, who sold him a coca-cola at the side place. The witness, Miss Marjorie Turner, who was parked at the cafe, testified that she saw Nichols, and another witness who saw him was one Davis, a minister of the gospel.

On Tuesday morning, October 13th, the body of Anderson was found in the Tennessee River about 15 feet above and to the left (going west), of the second ramp at Trotter's Landing. His car, which was a green 1946 Dodge, was found in 9 feet of water and about 30 feet from the east bank. Both front windows were down, but both ventilators were closed. The gear shift was in neutral, the ignition was on, and the lights were off. There were some dressed chickens and other small objects in

the back seat, which floated out the front windows as the car was being dragged out of the water. There were no marks or bruises on the body of Anderson, and the physician, who performed the autopsy, testified that while the matter could not be definitely determined, due to the fact that the body had been embalmed at that time, he was of the opinion that Anderson had drowned. This opinion was based in part upon the fact that trashy material was found in Anderson's windpipe. Anderson was about five feet nine inches in height, and weighed about 170 pounds. He was about 42 years old at the time of his death.

In the glove compartment of Anderson's car there was found three deeds signed by Nichols and his wife, conveying to Anderson, in exchange for other property Nichols owned in Nashville, Shelbyville and Columbia. There was also an unsecured promissory note in the sum of $2,000 made payable to Anderson, and signed by Nichols.

On the same date Anderson's body was found (Tuesday, October 13, 1953) Nichols went to the office of the Register of Maury County, and left for registration a deed executed by Anderson, conveying Brookwood Farms and the restaurant to Nichols. This deed was drafted on two sheets of paper, which were clipped together by fasteners that were easily removed. This deed had been presented to the County Court Clerk at Columbia, the day previous, Monday, October 12, 1953, and the transfer tax had been paid. On October 14, 1953, Anderson's relatives filed a civil suit in the Chancery Court at Columbia, to have the conveyance from Anderson to Nichols declared void.

Mrs. Jeanelle Brown testified that when she read about the finding of Anderson's body she called Nichols on the telephone and arranged a meeting with him. At this meeting Farrington was present. Mrs. Brown testified that she told Nichols that she did not understand that he and Anderson had exchanged property, but she thought that it was a cash deal; that Nichols then asked her if she did not remember that when the four were driving back from Columbia, Nichols and Anderson discussed exchanging the properties. Mrs. Brown testified that she told Nichols she remembered no such conversation. That, thereupon, Nichols told her, using profanity, it would be a good thing if she did remember. Also, that she would hate to end up in the river with a bullet hole in her head, and a concrete block around her neck.

Mrs. Brown testified that thereafter Nichols contacted her daily, and called her almost every night. She testified that in November, 1953, she was riding in the car with Nichols in the Crowley Wood section of Nashville, and asked him if he had not killed Anderson, and then Nichols told her that he and Farrington were at Brookwood Restaurant, and that Farrington and Anderson got into a scuffle inside the restaurant, and that Nichols and Farrington tied Anderson with a rope. This was in the late evening. He said that he and Farrington kept Anderson at the restaurant until after dark, and then put him in the car and drove to Kentucky Lake, where Farrington pushed Anderson in and he and Farrington rolled the car in. Mrs. Brown further testified that, after admitting the killing, he then reminded her of his threat, and also threatened bodily injury to her young child.

Mrs. Brown testified that she was under duress because of threats by Nichols, and she testified in the civil

suit the matters that Nichols wanted her to tell. That after Nichols' arrest and incarceration she changed her testimony. She testified that she should not harbor a murderer, and this was the reason she changed her testimony, and that she tried to get Nichols to go to Anderson's mother and sister and ask their forgiveness. She testified that after Nichols admitted killing Anderson he showed her an option to Brookwood Farms, and stated that Anderson had refused to exchange for his property, and that was his reason for killing him.

According to proof introduced by the State, Nichols boasted to his acquaintances that he had recordings of conversations of a number of men prominent in State politics, and would use these to keep from being prosecuted. Nichols employed William Edward Johnson in the summer of 1954 to blackmail witnesses in the civil suit in order to get them to withdraw their testimony.

The State's proof shows that Nichols rented two rooms in the Hotel Tulane in Nashville, and bored a hole through the wall so he could look from one room to the other; that Johnson got one of these witnesses to go into one of these rooms, this witness having testified against Nichols in the civil suit.

According to the State's proof Johnson got this man in a compromising position and when he did so Nichols, who had hidden in the adjoining room, with one Gruen, came into the room, and a picture was taken. Nichols said that he would use Johnson so that the same purpose might be carried out against witnesses who lived in Memphis and Jackson. Johnson states that they drove to West Tennessee on this mission, and as they crossed the Tennessee River at Trotter's Landing, Nichols pointed out the window of the car, and stated that was where

he killed a man, that after being questioned by Johnson, Nichols then made an effort to pass the matter off in a joking manner. Johnson testified that they were unsuccessful in getting the witnesses in Memphis and Jackson to fall for their scheme.

A number of witnesses testified for the State as to values of the properties involved. The lowest value placed on Anderson's property was as follows:

| | |
|---|---|
| The restaurant | $50,000.00 |
| The Farm | 75,000.00 |
| The restaurant equipment and furnishings | 12,780.00 |

Making a total of $137,780.00

The highest value placed on the Nichols property by witnesses, who testified for the State, was as follows:

| | |
|---|---|
| The Titcomb Apartments in Columbia | $18,500.00 |
| The property at 222 Woodland Street, in Nashville | 16,600.00 |
| The property in Shelbyville | 17,500.00 |

Making a total of $42,600.00

It was stipulated that these three properties belonging to Nichols were on October 9, 1953, encumbered to the extent of $24,209.34.

What has been related above constitutes the State's case.

Nichols, testifying in his own behalf, undertook to explain or deny all of the incriminating testimony against him. By his testimony it is evident that he undertook to picture himself as a man of large means and with an ability to take property of little value and work

it out so that it would bring a large price. He stated that he had been a member of one of the churches in Nashville for many years, but admitted that he seldom attended church. He admitted that he had been convicted in Florida in the Federal Court and had been sentenced and served a term in the Federal Penitentiary for the offense of using the mails to defraud. He also admitted that he had run liquor into dry counties in Middle Tennessee, for the purpose of sale, and that he possessed a sawed-off shotgun, the barrel of which was of unlawful length.

The defendant testified that when he and Mrs. Brown went to Memphis to discuss the deal with deceased, nothing was said about the price or terms of the transaction. He insists that early in September, 1953, when Anderson came to Nashville, they looked at Nichols' property with a trade ultimately in view and not as a mere pretext; that he and Anderson, on the way from Nashville to Columbia, discussed each other's property and that when they arrived in Columbia they went to the Titcomb Apartment house so that Anderson might see it. That Mrs. Brown and Farrington were travelling in another car; that on October 7, 1953, Anderson came to Nashville, and called him over the telephone. Nichols testified that it was then they agreed to look at all the properties the following day and this was done. He denied that any photographs were taken by prearrangement. Nichols further testified that on the way back to Nashville, he and Anderson discussed trading the Brookwood property for the Nichols' property at 222 Woodland Street in Nashville; the Titcomb Apartments in Columbia, and Nichols property in Shelbyville. He testified that Anderson wanted Nichols to give $5,000 between the properties but that Nichols offered $2,000 difference.

Nichols claimed that on Friday, October 9th, he and deceased agreed to trade the properties, Anderson agreeing to take his unsecured note for $2,000 as the difference. He claims that the deed from Anderson to Nichols was prepared in Nichols office in Nashville on October 9, 1953, and was dictated to Mrs. Garnand, his stenographer. That he and Anderson, accompanied by Farrington, then went to Columbia and to Brookwood Farms, and that they again met in Columbia on Saturday afternoon, October 10, 1953, about 4:30. Nichols further claims that they put Anderson out in front of the Titcomb Apartments, where his car was, about 6:00 P. M. Nichols claims he saw Anderson no more after that time.

Nichols testified that he went right on back to Nashville, and that he reached that City about 7:30 P.M. Saturday night, October 10, 1953, and that he did not leave after his arrival until the next morning. That on Sunday he went to Columbia with Mrs. Garnand, but denied he was in Humphreys County Sunday afternoon.

Nichols was corroborated in his alibi by his daughter-in-law, his son and his wife. One Fred Rausser also testified that he talked with Nichols over the telephone between 11:30 and 12:00 P. M. Saturday night.

Nichols stated that he made preparations for conveying his property to Anderson long before any trade was agreed upon, explaining this by stating that he thought that his offer was so good that Anderson could not possibly resist it. He further testified that on September 9, 1953, he had a Nashville attorney prepare a title letter on his Davidson County property. That on September 18, 1953, he had a Shelbyville attorney prepare a title letter on his Bedford County property. On September 25, 1953,

Nichols and his wife executed and acknowledged a deed conveying their Maury County property to Anderson. On September 28, 1953, Nichols had a Columbia attorney prepare a title letter on the Titcomb Apartments. On October 7, 1953 Nichols and wife executed and acknowledged deeds conveying the Davidson and Bedford County properties to Anderson. Nichols introduced testimony in an effort to show that Anderson's property was worth much less than the values placed on it by witnesses for the State, and that his own property was worth much more than the values placed on it by the State's witnesses.

The defendant denied an attempt to blackmail anybody, but admitted conducting the affair at the Tulane Hotel, not for the purpose of changing his testimony, but discredit him by showing the type of man he was. Nichols stressed the fact that Anderson had the reputation of being a homosexual and that persons with whom he associated immediately prior to his death were of this character. He denied telling his friends that he had recorded conversations to blackmail certain people, but he did admit that he had recorded a telephone conversation between Attorney General Reeder Parker and Phil Davis. He made elaborate preparations for wiring the hotel room in order to do this.

Mrs. Garnand, whom Nichols said wrote the deed from Anderson to himself on October 9th, left the country for Tokyo on November 3rd or 4th, 1953. Her deposition in the civil case had been set for November 4, 1953. The defendant sent interrogatories to her for use in the civil case, but she did not answer them.

In an attempt to show a suspicion of suicide, one John Jackson of near Trotter's Landing was introduced as a

witness and he stated that between nine and ten o'clock on Sunday morning, October 11, 1953, he was on the road that goes to Trotter's Landing when he was stopped by a stranger in a blue car. This man asked the witness if he was on the road to the ferry, and Jackson told him there was no ferry there. The stranger then said that if he did not stop he would drive right on in it. Jackson could not identify this man although he expressed the opinion that the car resembled the one that he had later seen being dragged from the lake.

The defendant insists that the conviction is not warranted by the facts of the case. He insists that the evidence fails to establish the *corpus delicti*, that is, a crime has been committed, by confessions alone.

■ However, the following statement was made by this Court in *Ashby v. State,* 124 Tenn. 684, at page 697, 139 S.W. 872, at page 875:

"The rule upon this subject, as announced by the later authorities, and the great weight of authority, is that, while the *corpus delicti* cannot be established by confessions alone, yet the confessions may be taken in connection with other evidence, direct or circumstantial, corroborating them, and, if from all the evidence so considered together the *corpus delicti* and the guilt of the person with reference thereto is established beyond a reasonable doubt, it is the duty of the jury to convict."

This case was recently reaffirmed in *Ricketts v. State,* 192 Tenn. 649, 241 S.W.2d 604.

■ The State takes the position that the facts and circumstances, independent of the confessions, lead to the conclusion that Anderson met his death by unlawful

means. The best evidence in the record shows that the deceased was drowned.

The record reveals three possible situations: (1) That Anderson committed suicide; (2) that he died from accidental means; and (3) that he was murdered.

The witness John Jackson's testimony would indicate that, perhaps, the deceased had some notion of taking his own life, but this witness could not identify the deceased nor could he identify his car. There is no testimony in the record that the deceased was melancholy or dejected, or that he had any intention whatever of taking his own life. Outside of his own weakness, as revealed by the testimony, it seems that he had never been in any trouble before and his purpose was to dispose of his property in Columbia, and then confine his investments to Shelby County.

It is further argued that, perhaps, Anderson accidentally drove his car into the water. This is not convincing in view of the undisputed fact that Anderson must have known that the ferry was no longer in operation at Trotter's Landing. Furthermore, his declaration to Mrs. Ingram just a few days before his death indicates that he was aware of the fact that the bridge over the Tennessee River on Highway 70 was open on the date mentioned.

The record reveals that Anderson drove from Memphis to Nashville by way of Camden on the 6th or 7th of October, 1953. The proof also shows that the bridge was open and the ferry did not continue to operate after the 24th or 25th of September, 1953. The deceased must have driven over this bridge from Memphis to Nashville on the 6th or 7th of October. If he knew that the bridge

was open why did he leave the normal route and attempt to cross the river by ferry?

It should be borne in mind that his automobile was out of gear or in neutral. There were no marks on the body. The automobile had both front windows open, but the ventilators were closed. Anderson's body was found outside of the car. The position of the gear shift would indicate that the car was not driven into the water, but it was pushed or rolled in. The fact that the body was outside of the car indicates that the automobile was empty when it was rolled into the water and that the body was put in separately. The State's evidence shows that the window in the front door of Anderson's automobile measured 12½ by 15½ inches. Bearing these facts in mind the State contends that although it is possible, it is highly improbable, that the body could have gotten out of the car after the automobile was in the water.

It is contended that after the deceased had drowned the force of the current might have been able to wash his body out of the window of the car. This is highly improbable. The steering wheel and post would act as a barrier to the removal of the body after death. Then we have the dressed chickens and other small articles on the back seat of the car, but they were not washed out with the current and remained in the car until it was pulled out by a wrecker. The deceased was less than six feet tall, weighed about 170 pounds. It is not probable that a man of this size after death could float out of a rectangular opening no larger than 12½ by 15½ inches.

It is argued that Anderson could have gotten out of the car and water while he was still alive. However, we should bear in mind the size of the window, and the fact that there were no bruises nor marks on the body of the

deceased. If Anderson had been alive when he left the automobile, he would likely attempt to open the door, but both doors were closed.

Had he attempted to go through the window we think that in all likelihood bruises would appear upon his body.

It is insisted that even if the *corpus delicti* has been proven, still the proof does not establish that he was the criminal agent responsible for Anderson's death. Many assaults are made upon the testimony of Mrs. Brown, but it must be borne in mind that the defendant was the first party to use her as a witness in the civil suit. The defendant undertakes to bring out the contradictory statements of this witness. Mrs. Brown explains the contradictions in her testimony, by stating that her previous evidence was prompted by threats of bodily injury to herself and her young son. Mrs. Brown explains these contradictions and we think her testimony rings true. *De Grafenreid v. Nashville Ry. & Light Co.*, 162 Tenn. 558, 39 S.W.2d 274; *Johnston v. Cincinnati, N.O.&T.P. Ry. Co.*, 146 Tenn. 135, 240 S.W. 429.

The defense also assails the testimony of Marjorie Turner. However, it is natural that this young lady would be embarrassed by telling about being out that late at night with a young man in such a place as she was.

These situations were explained by both Mrs. Brown and Miss Turner, and they were on the witness stand and seen by the jury and the trial court.

■■ As was said in *Stanley v. State,* 189 Tenn. 110, at page 117, 222 S.W.2d 384, at page 387:

"These proven facts certainly entitle the jury to draw reasonable inferences therefrom and this Court will not substitute its judgment or inferences

from these proven facts, this being a function of the jury. *Foster v. State,* 180 Tenn. 164, 172 S.W.2d 1003.''

''All elements composing the *corpus delicti* on trial for murder may be established by circumstantial evidence.'' *State v. Gillis,* 73 S.C. 318, 53 S.E. 487, 5 L.R.A.N.S., 571; *Younkins v. State,* 42 Tenn. 219, 221; *Lancaster v. State,* 91 Tenn, 267, 18 S.W. 777.

It must be borne in mind that the jury saw all of the witnesses testify, had the opportunity, that we do not have, of observing the manner and demeanor of the witnesses, as they testified in the lower court, and we cannot substitute our judgment for theirs. *Stanley v. State, supra; Ferguson v. State,* 138 Tenn. 106, 196 S.W. 140.

According to the State's testimony the property of the deceased was worth well in excess of $100,000 more than the property that Nichols claimed he traded to him. Anderson was a man slightly above forty years of age, and no doubt had considerable business ability. In addition to the vast difference in the value of the property, we have the admitted fact that the trade was not agreed upon until October 9th, yet Nichols had his attorney prepare a title letter on September 9th, one month before the trade was supposed to be completed. At this time he had no way of knowing whether Anderson would agree to the trade or not. The fact that these papers were prepared that long in advance shows that a deliberate fraud was planned.

On September 25th he executed a deed with his wife on his Maury County property. These matters lead to the conclusion that there was never any bona fide tran-

saction between Anderson and Nichols, but a deliberate and a planned fraud on the part of the defendant to fleece Anderson out of his property. The jury were well justified in concluding that any man who would do as the defendant has done would go to extreme lengths to accomplish his purpose, even to the extent of taking an innocent life.

When the facts are taken together and their total force is weighed, the only reasonable result that can be reached is that Anderson was murdered in the manner as related by Nichols to Mrs. Brown. The suggestion has been made that there were no visible marks on the body of Anderson, indicating violence. However, when taken in connection with all of the other facts and circumstances of the case, this record reveals that this murder was carefully planned by one having far beyond the average intelligence, both in education and in experience. The whole idea was to leave the impression that death came from accident or suicide. It could well be said that Anderson was strangled or that he was smothered, or perhaps beaten with a rubber hose that leaves no marks.

As suggested by the State, it could be possible that Mrs. Brown swore falsely, but is it likely that Walsh and the three people who saw Nichols at the Lakeview Cafe all falsify in their testimony?

Can we assume that the little Turner girl deliberately perjured herself on the witness stand when she swore against the defendant? This court takes judicial knowledge of the fact that it is very often difficult for the State to have the witnesses go upon the stand in a criminal case and bear witness against the defendant. More often these disinterested witnesses will evade or deny knowledge rather than go upon the witness stand

to assist in bringing about a conviction of a defendant in a criminal case.

Why was it that Anderson failed to have any of his deeds recorded before he left Middle Tennessee? He was within a few minutes walk of the court house in Columbia, at an hour when the Register's Office was open. Why would this man leave Columbia at night with these unrecorded deeds in the glove compartment of his car? Surely Anderson was a man of reasonable intelligence and why should he turn over all of his property to the defendant, whom he had known only a short time?

How is it possible to reconcile Nichols version of the trade with Anderson's repeated declaration of an intention to sell only for cash, and dispose of his Middle Tennessee holdings?

At the conclusion of the taking of proof in this case the jury was polled on motion of counsel for the defendant. The record reveals that these were twelve good and lawful men of Humphreys County. As their names were called they all responded ''guilty.'' Neither the deceased nor the defendant had ever been a resident of Humphreys County, but had resided at least 80 or 90 miles from Waverly, where the trial was held. This verdict of the jury was approved by a fair and able judge.

The record reveals that the jury was out for about two hours and twenty minutes, and came in for further instructions on the question of mitigating circumstances. That body returned for their deliberations and in about an hour came in with a verdict as hereinbefore set out. Some weeks later the trial judge heard a lengthy and full motion for a new trial, which the court, acting as the thirteenth juror, overruled and approved the verdict.

90

 It is insisted that the lower court committed reversible error in admitting in evidence testimony that Anderson had declared his intention to sell his property for cash. These declarations are admissible as a part *res gestae* of Anderson's trip to Nashville, and his transaction with reference to his property.

In *Ford v. State,* 184 Tenn. 443, 201 S.W.2d 539, 542, it was said:

"(7) 4. When last seen before her death she was on her way to meet the defendant, according to the uncontradicted testimony of her companion. Although the statement of the deceased to this effect made to Miss Aslinger was objected to as hearsay, this testimony was admissible as part of the *res gestae* under *Kirby v. State,* 15 Tenn. 259, and our other cases.

"(8) Quotation by a witness of what another said is not objectionable as hearsay when a relevant issue in the litigation is whether or not the quoted person made the statement. Here it was the fact that the deceased made this statement indicative of her purpose, thus reflecting her mental condition and planned course which was testified to by the witness. It was then for the jury to appraise the weight and significance of this declaration of deceased's intention, as bearing on the determinative issue of whether she met with her husband. It was a similar declaration made by the deceased of his place objective that was held in the *Kirby case, supra,* to be admissible. And see *Wigmore,* Volume 5, 3d Ed., Par. 1361."

 This evidence was permissible in that it shows Anderson's intention with regard to his property and

was a relevant inquiry in the trial of this case. See *Mutual Life Insurance Company v. Hillmon*, 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706..

■ We think the *corpus delicti* was proven independent of Mrs. Brown's testimony, and whether the confession was admitted before or after the independent facts and circumstances does not destroy its value. *Ashby v. State, supra.*

■ It is also objected the lower court was in error in permitting Miss Turner to be recalled in rebuttal, and to permit her to testify as to seeing defendant and Farrington at Trotter's Landing early Sunday morning. The court required the State's counsel to submit lengthy and detailed affidavits that they were unaware of the facts testified to by her in rebuttal, and did not know of these facts until a short time before their offer to re-introduce her. This testimony and the time of its introduction was largely a matter in the discretion of the court. *Martin v. State*, 157 Tenn. 383, 8 S.W.2d 479; *Hughes v. State*, 126 Tenn. 40, 74, 148 S.W. 543.

■ It is also insisted that it was error to permit the State's witness, Mrs. Posner, to testify as to defendant's admission that he had killed two or three people, and he guessed one more would not make any difference. That she, in this conversation with defendant, further stated that he reached in his pocket and pulled out a pistol, and among other things said, "Well, I got the property, didn't I?"

We do not think it was error in admitting this testimony, because his statement amounted to an admission of guilt. *Lovvorn v. State*, 192 Tenn. 336, 241 S.W.2d 419.

■ Furthermore, this testimony was not objected to

at the time. *Troxell v. State,* 179 Tenn. 384, 166 S.W.2d .777; *Turner v. State,* 188 Tenn. 312, 219 S.W.2d 188.

■ The defendant seeks to discredit the testimony of Mrs. Posner by testifying that she left his property owing him several hundred dollars in rents. However, this goes to the weight of her testimony and not to the admissibility.

We have considered all of the assignments of error, find them without merit and they are overruled.

■ This has been a long and fully developed trial. We have carefully looked into this record and we are of the opinion that the defendant has had a fair and impartial trial by a jury of his peers, and presided over by a fair and impartial judge. To set aside this verdict would be for us to say that the preponderance of the evidence shows that the defendant is innocent. This is not the case here, but we think, on the other hand, the great preponderance of the evidence is in favor of the verdict of the jury.

Let the judgment be affirmed.

NEIL, CHIEF JUSTICE, BURNETT and SWEPSTON, JUSTICES, and CLIFFORD E. SANDERS, SPECIAL JUSTICE, concur.