**STATE of Tennessee, Appellee,**

**v.**

**Sherry Kaye McALISTER, Appellant.**

Court of Criminal Appeals of Tennessee, at Jackson.

Nov. 25, 1987.

Petition to Appeal Denied by Supreme Court March 14, 1988.

W.J. Michael Cody, Atty. Gen. and Reporter, Norma Crippen Ballard, Asst. Atty. Gen., Nashville, Clayton Peeples, Dist. Atty., Trenton, for appellee.

L.L. Harrell, Jr., Harrell & Harrell, Trenton, for appellant.

## OPINION

O'BRIEN, Judge.

Defendant was indicted by the Gibson County Grand Jury for first degree murder. In a jury trial she was found guilty of voluntary manslaughter. · She was sentenced to five (5) years in the State Penitentiary as a Range I standard offender.

On this appeal she has raised twelve issues for review, by the first of which she says the verdict of the jury was contrary to the law and the evidence in the case.

In the early afternoon of 8 July 1985 the body of Dan Beckett was found in a motel room in the City of Trenton, Tennessee. He had checked into the motel under an assumed name the night before, about midnight. He was accompanied by an unidentified female. Medical evidence indicated Beckett died between 2:00 and 4:00 a.m. on 8 July 1985 from a .22 caliber gunshot wound to the right rear of his head. There was evidence that he may have engaged in some sexual activity prior to his demise and also evidence, through the testimony of his minister, that he had been involved in an extramarital affair which he intended to break off on the night he was killed. A spent .22 caliber cartridge hull was found in the bed where Beckett was shot. It matched five unspent cartridges found in a bedside table drawer in the McAlister home. A weapon, described as a long gun, as opposed to a pistol, was missing from the McAlister home on the night of the homicide. A member of the McAlister household left the residence at midnight on July 7th. The defendant was not there. This witness returned between 4:00 and 4:30 a.m. on July 8th. Mrs. McAlister and her husband were standing outside the house. Both appeared to be upset about something. This witness called defendant's parents who came to the McAlister home about 5:00 or 5:30 a.m. They stayed for about two hours and then took defendant and her husband home with them.

There was testimony from defendant's parents that after they arrived at her house she told them she might have gotten

herself into trouble. On direct examination of defendant's father he stated that he told a TBI investigating officer he had asked his daughter if she had done it and she said, "Yes, daddy." He also said he had told a friend, who was an Assistant District Attorney General, the same thing in confidence. On cross-examination he indicated his reference was to whether she was having an adulterous affair with someone, and not that she had killed Dan Beckett. He also testified Ted Ray McAlister, defendant's husband, had told him on two occasions that he killed Dan Beckett. One of these instances was in the presence of his son-in-law, Bobby Blackstock.

Defendant admitted she was with Dan Beckett the night of the homicide. She denied she had killed him. She admitted being involved with him but denied they had an intimate relationship. She said that on the night in question she left home about seven o'clock, called Beckett and went to Milan to pick him up. He suggested they go to Trenton to the motel. She wanted to talk to him about ending their relationship. After they arrived at the motel they talked for a time about things that had happened between them and Beckett had the impression she was going to leave with him to go up north. Ultimately, on his insistence, they went to bed together and he attempted to engage her in sex. She realized she couldn't go through with it and went to the bathroom to dress. He talked on the phone to somebody and when she told him she was going to leave he said, "Well, Judy was coming." She told him she was leaving and going home, that was it. She had no explanation for the evidence of sexual activity found on her underclothing. She knew nothing of the gun missing from her home. She never admitted to her parents that she had killed Dan Beckett and the only discussion she had with them was about her having committed adultery. She averred she did not know what her father was talking about when he asked her, "Baby, did you do this?" She admitted her response was, "Daddy, I done it."

In a chambers hearing, out of the presence of the jury, she informed the trial judge that she did not want three witnesses called, her father Gerald Floyd, James Jackson, or Bobby Blackstock, to testify her husband had made statements to them that he was guilty of the homicide of Dan Beckett. The trial judge explained the possibility that the evidence might tend to exonerate her, that if she were convicted of first degree murder it was possible she would face a term of life imprisonment in the State Penitentiary, and he solicited her understanding of these facts. She was emphatic in her decision not to use the testimony of those witnesses.

This was largely a circumstantial evidence case. The relevant question on appeal is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); T.R.A.P. 13(e). If the circumstantial evidence sufficiently shows all the elements of the crime and the defendant's connection to the crime, then that evidence is enough to support the verdict. See *State v. Peck*, 719 S.W.2d 553 (Tenn.Cr.App.1986). The evidence in this case, if properly admissible, was sufficient for a jury to find defendant was guilty of the homicide.

Defendant charges error to the trial court in permitting the State to reopen direct examination of William Sanders, Dr. Larry Williams and Larry Edward Hall. The questions addressed to each of these witnesses when they were recalled to testify were appropriate and proper. The recall of a witness to testify a second time is within the discretion of the trial judge. Caruthers, *History of a Lawsuit*, Eighth Ed., Gilreath, Aderholt, Sec. 336, Examination of Witnesses, p. 386; *State v. Johnson*, 685 S.W.2d 301, 306 (Tenn.Cr.App. 1984). The issue is without merit.

Defendant has raised an objection to the admission of the fingerprint records of the deceased through the testimony of the Gibson County Sheriff, who testified in reference to fingerprint records maintained in his office. There was no error. These

were business records which were properly admitted under the Uniform Business Records as Evidence Act. T.C.A. § 24–7–111. There was no question of confrontation. The deceased had previously been identified. The fingerprint card admitted in evidence was not prepared for use as evidence in this specific case. See *State v. Wilson*, 687 S.W.2d 720, 725 (Tenn. Cr.App.1984). The issue is without merit.

■ Also without merit is defendant's complaint that the Court excluded the testimony of the brother of the deceased and Dr. Larry Williams relative to alleged threats by defendant's husband toward the victim. It is always appropriate for a defendant, under indictment for a criminal offense, to prove that another person had a motive to commit the offense for which he is charged. *Sawyers v. State*, 83 Tenn. 694, 695 (1885). However, the evidence by which the guilt of a third party is to be established must conform to all the rules regulating the admission of evidence. Thus, the third person's guilt cannot be established by hearsay. Wharton's Criminal Evidence, 13th Ed., Torcia, § 195, p. 406. Defendant has offered no authority to support the admission of this evidence in the manner sought. See *State v. Galloway*, 696 S.W.2d 364, 369 (Tenn.Cr.App. 1985).

■ An issue is raised concerning the admission of the testimony of the Reverend Douglas Powell as to statements made by the victim. The Reverend Powell testified as follows:

A. He talked to me before for his spiritual counseling, and he had been moved spiritually over the past few weeks and this particular night in question, he let me know that he had things right with the Lord and that he was real concerned about getting his life together and he said he had some problems in his life that unless he got ironed out, that he couldn't proceed and be what he needed to be, but the primary thing he had to get ironed out, he was having an affair with a married woman.

Q. Did he tell you about anything he was going to do about that situation?

A. He told me that he was going to dissolve that that evening.

There is good authority why this evidence should have been admitted as an exception to the hearsay rule. We believe the rule stated in *Kirby v. State*, 15 Tenn. 259 (1834), still prevails. In that case the defendant was found guilty of the murder of Peter Elrod. The State was allowed to prove by the testimony of a witness that Elrod had told him the evening before the day he was found missing that he was going the next day to Pine Mountain to hunt a saltpetre cave. The court found this evidence was properly admitted as part of the transaction to explain the reasons why Elrod was in the Pine Mountain area, and constituted a fact in the cause. This rule was followed in *Ford v. State*, 184 Tenn. 443, 201 S.W.2d 539, 542 (1945), in which a co-worker of Mrs. Ford was allowed to testify that at 1:00 a.m. on 10 March 1944, while they were waiting for a bus, Mrs. Ford said she was on her way to meet her husband. She was never seen alive again. The testimony was admitted as part of the res gestae under *Kirby*, supra, and other cases. The court said:

"Quotation by a witness of what another said is not objectionable as hearsay when a relevant issue in the litigation is whether or not the quoted person made the statement. Here it was the fact that the deceased made this statement indicative of her purpose, thus reflecting her mental condition and planned course which was testified to by the witness. It was then for the jury to appraise the weight and significance of this declaration of deceased's intention, as bearing on the determinative issue of whether she met with her husband. It was a similar declaration made by the deceased of his place objective that was held in the Kirby case, supra, to be admissible. . . ."

More recently in *Nichols v. State*, 200 Tenn. 65, 289 S.W.2d 849, 859 (1956), the statement of a homicide victim made prior to his death relative to his intention to sell his property for cash was admitted to show his intention with regard to his property and was a relevant inquiry in the trial of the case. We hold that the expression of intent by Beckett to clean up his act was admissible through the testimony of his minister.

**440**

Defendant insists that the evidence of her father's statement to Assistant Attorney General Albert Schoonover was inadmissible because it was communicated to him as a friend and as an attorney. She insists it constituted improper conduct upon the part of the Assistant Attorney General because he failed to advise Mr. Floyd that any information given to him would be communicated to the authorities for investigation and could be used against his daughter.

We have read this record thoroughly and it does not bear out defendant's complaint. It is clear that Mr. Floyd was well aware of Mr. Schoonover's status as an officer on the Attorney General's staff. If it was his intent to confide in Mr. Schoonover it is a matter of no consequence. As we have noted previously he revealed the same information and made the statement to a TBI officer who talked with him in the course of his investigation. The issue is without merit.

Defendant complains that it was a violation of her constitutional right against self-incrimination to require her to furnish samples of hair and body fluids without advising her of her rights. The law is that the Fifth Amendment privilege against self-incrimination protects an accused from being compelled to testify against himself or from otherwise providing the State with evidence of a testimonial or communicative nature. The privilege does not apply to evidence or acts non-communicative in nature. *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 1830–31, 16 L.Ed.2d 908 (1966). There was no constitutional violation in this instance and the issue is overruled.

We find this record free of reversible error and affirm the judgment of the trial court.

SCOTT, J., concurs.

DAUGHTREY, J., concurs in the result.