# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### August 3, 2010 Session

## STATE OF TENNESSEE v. AUBREY TREMAINE EISOM AND CEDRIC MOSES

**Appeal from the Circuit Court for Dyer County**
**Nos. 08-CR-228 and 08-CR-470     Lee Moore, Judge**

---

**No. W2009-02098-CCA-R3-CD   -   Filed November 5, 2010**

---

A Dyer County Circuit Court jury convicted the defendant, Aubrey Tremaine Eisom, of two counts of first degree felony murder and one count of especially aggravated robbery and convicted the defendant, Cedric Moses, of two counts of the facilitation of first degree felony murder and one count of especially aggravated robbery. The trial court sentenced Mr. Eisom to consecutive sentences of life imprisonment for both of the felony murder convictions and a consecutive sentence of 40 years' incarceration for the especially aggravated robbery conviction. The trial court sentenced Mr. Moses to 25 years' incarceration for each of his three convictions and ordered the sentences to be served concurrently, for a total effective sentence of 25 years. In this appeal, Mr. Eisom contends that the trial court erred by denying his motion for a bill of particulars, that the trial court erred by denying his motion to sever his trial from that of Mr. Moses, that the trial court erred by prohibiting him from presenting a "third party defense," and that the evidence was insufficient to support his convictions. Mr. Moses also challenges the sufficiency of the convicting evidence, claiming that the State failed to sufficiently corroborate the testimony of accomplice Ewan Dewayne Anthony. Mr. Moses additionally asserts that the trial court erred by refusing to sever his trial from that of Mr. Eisom and that his sentence is excessive. Discerning no error in the judgments of the trial court in Mr. Eisom's case, we affirm Mr. Eisom's convictions and the accompanying sentence. Because the State failed to produce sufficient evidence to corroborate the accomplice testimony relative to Mr. Moses' involvement in the crimes, we reverse Mr. Moses' convictions and dismiss the charges against him.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed in Part; Reversed and Dismissed in Part**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and J.C. MCLIN, JJ., joined.

Ralph Lawson, Dyersburg, Tennessee, for the appellant, Aubrey Tremaine Eisom.

Noel H. Riley, II, Dyersburg, Tennessee, for the appellant, Cedric Moses.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; and C. Phillip Bivens, District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The convictions in this case relate to the execution-style murders of Jeffery "Snap" McMullin and Cristin Robinson during the course of the especially aggravated robbery of Mr. McMullin at Mr. McMullin's residence in Dyer County.[1]

Shortly after 11:00 p.m. on August 13, 2007, Barbara Ford was at her home when she heard someone banging on her door and a little boy's voice yelling. Thinking that the boy said, "[M]y cat is dead," Ms. Ford answered the door to find five-year-old Xavier Johnson, who was clad in only blue jeans and socks, covered in blood and "hysterical." Xavier said, "Take me home to my mama; my daddy is dead; he already dead." When Ms. Ford tried to assure him that his father was not dead, Xavier said, "Some gangsters killed my daddy." She asked if he had seen the perpetrators, and he said, "Yeah." She then asked what they had said, and Xavier replied, "Where the money at?" At that point, Ms. Ford went to a neighbor's apartment to call police. She said that Xavier's father lived "[a]bout half a block" from her apartment. She stayed with Xavier and rode with him to the police department.

Ms. Ford clarified that Xavier said "[g]angsters" had killed his father and not "gangster" had killed his father. Ms. Ford also said that she had known Mr. Eisom for 16 years and that, in her opinion, he was "a nice young man."

Dyersburg Police Department Officer David Dodds responded to Ms. Ford's call. Xavier told Officer Dodds, "My daddy's dead," and he directed the officer to Mr. McMullin's residence. After leaving the McMullin residence, Officer Dodds took Ms. Ford and Xavier to the police station and let Xavier watch cartoons rather than ask him any questions about the murders. He explained, "I knew he was gonna have to tell that story to somebody other than me. I didn't want [him] to have to tell it more than once." Eventually Officer Dodds turned Xavier over to Dyersburg Police Lieutenant Billy Williams.

---

[1]Ms. Robinson's first name is spelled Cristin, Cristen, and Kristen in different portions of the transcript. As is the practice of this court, we utilize the spelling in the indictment.

Dyersburg Police Department Sargeant Jason Alexander responded to Mr. McMullin's residence on Upper Finley Road and found the front door ajar. In the bedroom, he "found the two victims l[y]ing in the floor." After determining that no one else was in the house, Sargeant Alexander and the other officers secured the scene and waited for investigators to arrive.

Lieutenant Billy Williams interviewed Xavier, who was present with his mother and uncle, and Xavier told him, "Gangsta killed my daddy." Xavier elaborated that "Gangsta" and another individual killed his father and "a white girl," who he called "Kris." Xavier told Lieutenant Williams that the assailants first shot Ms. Robinson in the mouth and then shot Mr. McMullin in the ear. Xavier said that his "Uncle Gangsta" "had a small gun and the other boy had a[n] oozie," which Xavier described as a "machine gun" that made a "b-r-r-r" sound when it was fired. Xavier described his "Uncle Gangsta" as a "dark complected" African American with "no hair," "a big nose[,] and gold teeth." The only description he could provide of the other assailant was that he wore a blue hat.

Mr. McMullin's cousin, Tamika McMullin, testified that she had known both defendants for approximately 15 years, that Mr. Eisom's nickname was "Gangsta," and that Mr. Moses' nickname was "Big Bo." Mr. McMullin, whose nickname was "Snap," commonly had both illegal drugs and money in his possession. Tamika and her sister drove Xavier and his mother, Shameil Johnson, home from the police station.[2] When they arrived at Ms. Johnson's residence, "Big Bo and Robot w[ere] standing outside" next to "a maroon Impala." She said the men "approached the car and w[ere] talking to Xavier, asking him questions about what had happened that night." Tamika told the men to "leave him alone. Get away from the car."

Tarmara McMullin held Xavier on her lap during the trip from the police station to Ms. Johnson's home. As they rode together, Xavier told Tarmara that his "Uncle Gangster" had murdered his father.

Dyersburg Police Department Officer Jim Joyner arrived at the scene and "recognized the victims to be Crist[i]n Robinson and Jeffery McMullin." After being informed that Xavier had identified "Uncle Gangster" as one of the perpetrators, Officer Joyner focused his investigation on Mr. Eisom, whose street name he knew to be "Gangster." He then attempted "to locate vehicles . . . that Mr. Eisom had been traveling in" and found one, a burgundy Impala, behind the Briarwood Apartments parked near the apartment of Atonya Yarbro. In a dumpster located near the vehicle, officers found "a partial box of

---

[2]Because several of the witnesses share the same surnames, we will use their first names for the sake of clarity.

Winchester brand 9mm ammunition, a pair of latex rubber gloves all stuffed in the box, [and] 21 live rounds of ammunition."

When questioned initially, Mr. Eisom claimed to have been "with Dwayne Armstrong getting drunk." Later, Mr. Eisom said that he had been with his "'baby's mama' all night." Sometime in 2008, Officer Joyner received information from a confidential informant that "Paris Wilson would have information about who was involved in the homicide." Paris Wilson was "the girlfriend of Ewan Dwayne Armstrong and she was living in Rayville, Louisiana at the time." Officer Joyner interviewed Ms. Wilson on May 14, 2008, and she implicated Mr. Armstrong in the murders. Mr. Armstrong gave a "complete confession" in October 2008. Based upon Mr. Armstrong's statement, Officer Joyner went to a field in an attempt to locate "[b]urned clothing including shoes, shirts, [and] pants that were allegedly burned following the incident." They were not able to recover the items because the field "probably had been plowed and planted since the incident occurred." In his statement, Mr. Armstrong was able to reveal facts that, until that time, were "[k]nown only to law enforcement and persons who were inside the residence when the incident occurred."

Officer Joyner admitted that there was no evidence placing Mr. Eisom in the maroon Impala on the day of the offenses and that the interior of the Impala was not dusted for fingerprints. In addition, no fingerprints were recovered from any of the items found in the dumpster and the officers could not affirmatively determine who had placed the items in the dumpster.

Dyersburg Police Department Evidence Technician Thomas Langford responded to Mr. McMullin's residence and observed a cellular telephone in the middle of the living room floor. A short time later, another officer noticed that the telephone appeared to be on, so Officer Langford picked it up and determined that Kelly Coles was on the other end. Officer Langford learned that the telephone belonged to Mr. McMullin and that Ms. Coles lived in Mayfield, Kentucky. Officer Langford also found a $20 bill and a $10 bill on the ground on the west side of Mr. McMullin's house. None of the physical evidence recovered from the scene, however, connected either Mr. Eisom or Mr. Moses to the murders. Officers found marijuana and more than $500 in cash inside Mr. McMullin's residence.

Within "a week or two" of the homicides, Officer Langford took a statement from Mr. Armstrong wherein Mr. Armstrong denied any involvement in the murders.

Kelley Coles, the mother of two of Mr. McMullin's children, testified that at approximately 10:00 p.m. on the evening of August 13, 2007, she was on the telephone with

Mr. McMullin when she heard him say, "Don't do this in front of my son. Just hold on, . . . I don't have a gun . . . take whatever you want." She also heard a female voice, Xavier's voice, and two male voices. She said, "After a few minutes I heard gunshots . . . . I heard two different sets of gunshots." Ms. Coles remained on the telephone for "close to an hour" before Officer Langford picked up the telephone and spoke to her. During that time, she heard other voices and noises in the house. After she talked to Officer Langford, Ms. Coles called several of Mr. McMullin's friends, including Mr. Eisom, who was "[a]t his girlfriend's with his girlfriend."

Atonya Yarbro, who was living at 2203 Parr Avenue, Briarwood Apartments on August 13, 2007, allowed Mr. Moses, who often drove a maroon Impala like the one found outside Ms. Yarbro's apartment on the day following the murders, to stay with her "[o]ff and on." When Ms. Yarbro left for work on August 13, 2007, Mr. Moses was at her apartment, and the Impala was parked outside. When she returned home from work sometime after 11:00 p.m., Mr. Moses was gone, and the Impala was not in the parking lot. Despite her apartment's having two bedrooms, Ms. Yarbro and her son slept on the couch on the evening of August 13, 2007. When she awoke the following morning, the "cover was just messed up" on one of the beds in one of the bedrooms, but Ms. Yarbro could not say with certainty whether Mr. Moses had been in the apartment during the night. She said that Mr. Moses had a key to the apartment.

Nakeshia McClain, the mother of one of Mr. Eisom's children, testified that Mr. Eisom's nickname is Gangster and that Mr. Moses, who is her uncle, went by the nickname of "Bo." The maroon Impala belonged to her, and she allowed Mr. Moses to use the car "from time to time." After she lost her job and was unable to make payments on the car, Ms. McClain allowed Mr. Eisom to drive the car for a short period of time.

According to Ms. McClain, Mr. McMullin was a friend of both defendants, but Mr. McMullin and Mr. Eisom "were more like brothers." Mr. Eisom had given Mr. McMullin "a car when he . . . first got out of prison" and had helped take care of Xavier during Mr. McMullin's incarceration.

In addition to the child he fathered with Ms. McClain, who was born on December 12, 2007, Mr. Eisom and Annwan Miles had a child together on July 30, 2007. As a result, Mr. Eisom stayed overnight with Ms. Miles in the summer of 2007.

Dyer County Sheriff's Department Officer Terry McCreight, who lived next door to Mr. Eisom's mother, saw Mr. Eisom, Mr. Moses, and another black male standing together in her driveway when he got home from work at approximately 6:00 p.m. on August 13, 2007. Mr. McMullin's neighbor, Joe Blue, also saw Mr. Eisom and Mr. Moses together

on the afternoon of August 13, 2007, although he recalled that they were driving a small green car.

In the fall of 2008, Officer McCreight received a call reporting that weapons had been discovered in an abandoned house on McGuire Road. He recovered the weapons, which had been "drug . . . out from underneath a wood porch and they were in a plastic bag, garbage type bag." Both weapons were loaded, but neither weapon was linked to Mr. Eisom or Mr. Moses.

Tennessee Bureau of Investigation Special Agent and firearms examiner Dan Royse examined the Charter Arms Model 44 "five shot revolver" and the HiPoint 9mm Luger recovered by Officer McCreight. He concluded that the Charter Arms Model 44 revolver fired the three bullets recovered from Mr. McMullin's body and that the HiPoint 9mm Luger semi-automatic carbine, or short rifle, fired the bullets recovered from the mattress and floor in the bedroom of Mr. McMullin's residence. Both weapons were very muddy and very rusted.

Agent Royse also examined the 9mm cartridge casings found at the scene and concluded that the bullets were manufactured by Winchester, which was the same manufacturer and caliber as the box of ammunition discovered in the dumpster. He compared the manufacturer's marks on the cartridge casings found at the scene with the live ammunition found in the dumpster and determined that three of the 21 live cartridges from the dumpster were manufactured by the same "bunter tool" as the cartridge cases found at the scene. He explained, "A bunter tool is basically a hardened steel dye with raised numbers and letters in reverse on it. And they're brought down under tremendous pressure onto the brass head of the cartridge or cartridge case and it basically stamps those characters into the heads." The expected life span for a bunter tool used by Winchester is 180,000 cartridges. A live cartridge recovered with the 9mm weapon was manufactured "using the same bunter tool" as six of the live cartridges in the box of ammunition recovered from the dumpster. Agent Royse testified that the most he could say with regard to the bullets recovered from Mr. McMullin's body and those found in the dumpster "is that they were manufactured using the same tool which would put them within a day or two of production life." He emphasized, "I can't say that the cartridge case from the crime scene came from that box of ammunition. I can say it's consistent with it, but I can't say that it came from that one."

Ewan Dwayne Armstrong, who was incarcerated on charges of two counts of first degree murder and one count of especially aggravated robbery in connection with the victims' deaths, testified that he had not reached a plea agreement with the State but had agreed to testify against Mr. Eisom and Mr. Moses. Mr. Armstrong, who had been previously convicted of bank robbery and incarcerated in a federal penitentiary in Louisiana,

-6-

testified that he was living in Evansville with his then-pregnant girlfriend, Paris Wilson, and her two-year-old son in a house provided to them by his aunt on August 13, 2007. Mr. Armstrong, who was a friend of both defendants, testified that on that day, he and Mr. Eisom were walking Mr. Eisom's pit bull dog and discussing the financial difficulties occasioned by the impending births of their children when Mr. Eisom suggested to Mr. Armstrong that they rob Mr. McMullin "to get some money together." According to Mr. Armstrong, Mr. Eisom claimed to know "[w]here he kept his money and drugs" and expressed a preference to go into Mr. McMullin's house when Mr. McMullin was home "to make sure he got everything out of the house."

Later that same night, Mr. Eisom came to the residence Mr. Armstrong shared with Ms. Wilson and asked Mr. Armstrong if he was "ready." Mr. Armstrong recalled that, "Big Bo was still standing outside by the car," which Mr. Armstrong identified as the maroon Impala later found parked outside Ms. Yarbro's apartment. Mr. Armstrong dressed in "black jogging pants" and a black t-shirt because Mr. Eisom was clad in "some faded black jeans and some old worn work shoes and a black shirt." He said that the three men smoked a "blunt," which he described as a cigar "[w]ith weed inside of it," before they left. Mr. Moses drove the car while Mr. Armstrong armed himself with a 9mm carbine and Mr. Eisom armed himself with a Charter Arms revolver. Mr. Armstrong said that Mr. Moses dropped him and Mr. Eisom off in a cul-de-sac across from Mr. McMullin's residence and that the two men made their way "around the back of the house," where they waited on either side until Mr. McMullin arrived in his car. Both Mr. Armstrong and Mr. Eisom had fashioned t-shirts into "makeshift masks" so that their faces were concealed, with "[n]othing[] showing but [their] eyes."

When he heard the car door close, Mr. Armstrong came out of his "hiding spot" and saw Mr. Eisom walking toward Mr. McMullin with his gun drawn. According to Mr. Armstrong, Mr. McMullin, who had been talking on a cellular telephone, "had his hands up but he still had the phone to his head." Mr. Armstrong said that Mr. McMullin "said something to the effect of not in front of his son, while his son was in the house and . . . he said he didn't have a gun on him or any kind of weapon." When they entered the house, Mr. Armstrong saw Ms. Robinson and Xavier seated on the couch. Mr. Armstrong said that once inside the house he "veered to the left into the bedroom" so that he could "see if anybody was in the house, but they wasn't." While he was in the bedroom, Mr. Armstrong "heard a lot of clutter and a lot of rattling going on in the front room." He went back toward the living room and saw that Mr. Eisom was "roughing Jeffery up, like tossing him around or whatever and he had the pistol on him." At that point, Ms. Robinson took Xavier into the bedroom where Mr. Armstrong still stood. He heard Mr. Eisom and Mr. McMullin talking in the living room. He described the conversation:

I heard [Mr. Eisom] tell him, he was saying something to the effect that – he was saying something about $75; he was like, that's all I'm worth. He was like, nigga I loves you and [Mr.] McMullin was saying back to him I love you, too; we supposed to be brothers. And [Mr. Eisom] was saying stuff like, if I was supposed to be your brother you left me in that jail and you ain't give a F about me or whatever. So there was a lot of that going back and forth and I heard him saying come on, Gangster, man, ain't gotta be like this man.

Then Mr. Eisom led Mr. McMullin into the bedroom where Mr. Armstrong, Ms. Robinson, and Xavier were. Mr. Armstrong said that he searched the bedroom but found no money or drugs. When Mr. Eisom asked, "[W]here's the rest of it," Mr. McMullin "stood up and he reached in his pocket and he grabbed a wad of money out of his pocket and threw it on the bed." Mr. Armstrong retrieved the money and put it into the pocket of the shorts he was wearing underneath his jogging pants. Mr. Eisom then told Mr. McMullin to get down on his knees, and Mr. McMullin complied. Mr. Eisom then shot Mr. McMullin three times in quick succession. Mr. Armstrong claimed that after shooting Mr. McMullin, Mr. Eisom "snapped the pistol out of [Mr. Armstrong's] hand and he put it to the back of [Ms. Robinson]'s head and he shot one time." At the time Ms. Robinson was shot, she had her body folded protectively over Xavier, so that she was kneeling somewhat on the bed. Mr. Armstrong denied shooting either of the victims.

Mr. Armstrong said that following the murders, he and Mr. Eisom made their way out of the house, across the street, "through the projects, through this field" and across a "big ditch" and then Mr. Eisom used his cellular telephone to call Mr. Moses to pick them up. Once in the car, Mr. Eisom said to Mr. Armstrong, "I wasn't trying to give you no case back there. I had to do it like that because I only had three bullets." Mr. Eisom then told Mr. Moses that he had murdered the victims. Mr. Moses drove to Mr. Armstrong's residence, dropped Mr. Armstrong off, and then drove to get gas while Mr. Eisom went back to the field to recover the revolver he had dropped as they ran.

When the two men returned to Mr. Armstrong's residence "about fifteen to twenty minutes" later, Mr. Moses told them that he had heard that Xavier had told police that Gangster had killed his father. The three then got back into the maroon Impala, and Mr. Moses drove them to "the country," where Mr. Armstrong and Mr. Eisom placed their clothes in a box and set them on fire using the gasoline procured by Mr. Moses as an accelerant. After returning to Mr. Armstrong's residence, Mr. Eisom gave Mr. Armstrong $700 of the $1900 in robbery proceeds and asked him to dispose of the weapons. Mr. Eisom also divided the drugs the pair had taken during the robbery. He said that Mr. Eisom kept

-8-

$200 or $300 for himself and gave the rest to Mr. Moses. Mr. Armstrong explained that Mr. Eisom "had already made a determination he was gonna turn himself in."

Mr. Armstrong said that after Mr. Eisom and Mr. Moses left, he wiped the guns down, placed them in a plastic garbage bag, and put them under the porch of an abandoned house in Middle City. He said that when he returned home, he woke Ms. Wilson and told her what had happened, explaining that he might send her back to Louisiana to avoid being the target of retribution for the victims' murders.

Mr. Armstrong admitted that when he was initially questioned by Dyersburg authorities, he denied any involvement in the crime. He also admitted that when he was later arrested in Rayville, Louisiana on June 10, 2008, he initially told the officers, "I didn't kill anybody and I didn't rob anybody." He stated that he opted to provide a full confession when he returned to Tennessee and had gotten "proper advice from [his] counsel." Mr. Armstrong denied any "bad blood" between him and the defendants and said that he had no reason to lie about their involvement in the crimes.

Mr. Armstrong stated that he knew Ms. Robinson's husband, Jonathan Robinson, but said that he had not seen Mr. Robinson since he had been released from federal prison. He said he also knew Ms. Robinson because, at the time of her murder, she was dating his friend, Carlos Sharp. Mr. Armstrong denied seeing Mr. Robinson in city court on August 13, 2007, and denied having any discussion with Mr. Robinson about the burglary of Mr. Robinson's residence.

Mr. Armstrong's former girlfriend and the mother of two of his children, Paris Wilson, testified that on August 13, 2007, Mr. Eisom, who she knew as Gangster, and another man, who she described as a large black man, came to the small one bedroom house she shared with Mr. Armstrong, and she "peeped" out of the bedroom window to see "the burgundy Impala parked like backed up in the driveway." She identified a photograph of the maroon Impala found parked outside the Brookside Apartments on August 14, 2007, as being like the car she saw, but she stated that the Impala she saw had darker tinted windows. She said that Mr. Armstrong left with the men and that when he returned sometime later, the two argued because she accused him of leaving "to be with somebody else." Mr. Armstrong at first claimed he had been "riding around . . . busting blocks." She said she did not believe him because "it don't take that long to bust blocks." Ms. Wilson said that Mr. Armstrong left their home and returned only once and that he had not come and gone several times as he testified. Eventually, Mr. Armstrong told her what had happened: "He told me that something bad had happened. I said something bad like what. And he was like I can't tell you. I was like well, you gonna tell me something. So that's when he told me. Told me that Gangster had killed somebody." She said that Mr. Armstrong did not provide any further

details about the offenses.

She said that she remained in Dyer County for only one week before she returned to her hometown of Rayville, Louisiana and that Mr. Armstrong came to Rayville when she gave birth to their child in December 2007. She did not tell anyone about Mr. Armstrong's revelation until the following year when she was contacted by Dyer County investigators. Ms. Wilson said that the thought of calling the police to report the murders never crossed her mind.

Davidson County Assistant Medical Examiner and forensic pathologist Doctor Feng Li testified that Mr. McMullin suffered three "penetrating gunshot wounds, meaning the bullets [were] still inside the body." Gunshot wound A was "located on the left flank area," and it "penetrated through the left posterior lateral aspect of the rib cage, specifically the eighth rib, perforated the diaphragm, the lower lobe of the left lung, the heart and a bullet [was] lodged and recovered subcutaneously . . . on the right side of the chest wall." Gunshot wound B was "on the left lower back," and it "penetrated through the abdominal cavity and injured left kidney medullaries meaning, you know, the softer tissue around intestines and intestines itself and" the bullet was recovered "inside the abdominal wall." Gunshot wound C was "on the right posterior shoulder, and it penetrated "the skin, the muscle and the bone of the right shoulder" and was recovered from "the right chest wall." Gunshot wounds A and B traveled from back to front, right to left, and upward. Gunshot wound C traveled from back to front, right to left, and downward. Gunshot wound A was "the most serious because it damage[d] lung, the heart and so on." Mr. McMullin would have succumbed to that wound "within minutes, if without any rescue effort."

Ms. Robinson suffered a single gunshot wound to the head. "This gunshot wound [wa]s a contact, perforating gunshot wound of the left oc[c]ipital region meaning on the back of . . . the head." The "searing" and "soot material" around the wound indicated that the muzzle of the gun had been resting on Ms. Robinson's head when the shot was fired. Doctor Li explained,

> This wound is on the left side on the back of the head and the bullet penetrated through but not penetrated into the cranial cavity, meaning not inside of the head but penetrated through the high level of the spinal column and caused some epidural hemorrhage around the spinal cord and some synovial hemorrhage on the cerebellum although, you know, the bullet does not penetrate into the head itself but the power, the pressure causes some hemorrhage around the cerebellum and the bullet exits through the right side of the cheek.

-10-

The bullet "[t]raveled forward, rightward and slightly downward." Damage of the type caused by the gunshot wound would have caused Ms. Robinson to die "instantaneously." He also found "multiple varying colored contusions on the body" of Ms. Robinson.

Ms. Robinson's husband, Jonathan Robinson, testified that the couple had been married for five years at the time of the murders, but they had been separated for "[s]ix to eight months." Mr. Robinson admitted that he assaulted Ms. Robinson on November 19, 2005, on March 12, 2006, and again on July 31, 2007, stating, "[N]o marriage is perfect." He blamed the assaults, during which he lifted Ms. Robinson off of the ground and "slammed her," on his intoxication "with alcohol, weed and a lot of pills." He recalled being released on bail on drug charges on the afternoon of August 13, 2007, and admitted that he also attended city court on that same day because he had violated Ms. Robinson's order of protection by going to her place of employment. Mr. Robinson, who remained in the marital residence following the couple's separation, said that he did not know where Ms. Robinson was living at the time of her death and that, although he knew Mr. McMullin, he did not know where Mr. McMullin lived or that Ms. Robinson was with Mr. McMullin on August 13, 2007. Mr. Robinson admitted telephoning Ms. Robinson at 8:42 p.m., 9:07 p.m., and 9:16 p.m. on August 13, 2007, and leaving threatening messages on Ms. Robinson's cellular telephone. He explained, "I was threatening to beat her up because of what she did." Mr. Robinson denied playing any role in the murders.

Mr. Robinson testified that officers came to his residence at 3:30 a.m. on August 14, 2007, and that he thought they were there to "see if [he] had any more weed." He said that he did not believe it when officers told him that Ms. Robinson had been killed.

Dyersburg Police Department Investigator Monty Essary went to Mr. Robinson's residence just after the murders and observed that the hood of Mr. Robinson's car was cool and that there were no lights on in the home. When he answered the door, Mr. Robinson was dressed in "boxer shorts and [a] wife beater" and appeared to have been asleep. He allowed the officers to look through his house. When they told him that Ms. Robinson had been murdered, Mr. Robinson "just lost it, just started crying." He gave officers consent to search the residence, and they found no weapons or drugs.

Following this proof, the State rested. Mr. Moses presented no proof. Mr. Eisom, however, presented the testimony of several witnesses.

Local bail bondsman Larry Baltimore posted a bond for Mr. Eisom on August 13, 2007, and then drove Mr. Eisom to a residence in Milltown. Mr. Baltimore described Mr. Eisom as a "fine young man," despite knowing that Mr. Eisom had been previously incarcerated for a conviction of aggravated robbery wherein he shot the victim.

Willie Moorer, who lived with Mr. Eisom's mother, Cathy Gardner, testified that on August 13, 2007, Mr. Eisom ate dinner with him and Ms. Gardner and that at approximately 8:30 or 9:00 p.m., he drove Mr. Eisom "[t]o his baby mama house." He dropped Mr. Eisom off at Ms. Miles's residence and left. Mr. Eisom and Mr. Armstrong walked Mr. Eisom's dogs before dinner on August 13, 2007.

Annwan Miles, the mother of Mr. Eisom's daughter born in July 2007, testified that although she and Mr. Eisom were not romantically involved at the time their daughter was born, they "made arrangements that [Mr. Eisom] would stay [at Ms. Miles's residence] and help" following her birth. On August 13, 2007, Ms. Miles, her three-year-old daughter, Quentera, and Laquanda Matthews' three-year-old daughter, Sereta, were at Ms. Miles's residence with Mr. Eisom and the newborn baby. Mr. Eisom arrived at her home at "[a]bout 9:00" p.m., and she "took a shower and went to bed." Ms. Miles said that her infant daughter "was real spoiled. She cried too much. So we basically had to hold her all the time." She said that Mr. Eisom came to the home on August 13, 2007, to hold the baby because she "wasn't gonna do it." When she finished her shower, Ms. Miles went to bed and left Mr. Eisom babysitting the three little girls. Sometime later, she got a call from Terry Lee Adams, who asked to speak to Mr. Eisom. Ms. Miles maintained that the baby would have cried if Mr. Eisom had put her down and that she did not hear the baby cry all night. After receiving several telephone calls, Ms. Miles asked Mr. Eisom to leave the apartment because she feared for her own safety and for the safety of the children.

Mr. Eisom's cousin, Laquanda Matthews, testified that on August 13, 2007, she took her three-year-old daughter to Ms. Miles's residence to spend time with Mr. Eisom because "she liked being around him." She let her daughter spend the night with Mr. Eisom and Ms. Miles. When she awoke the following morning and saw Mr. Eisom's photograph on the news, she called 9-1-1 and asked police not to hurt Mr. Eisom because her daughter was with him. She also saw Mr. Armstrong walking from the direction of Ms. Gardner's house at approximately 8:00 p.m. on August 13, 2007.

Ms. Gardner and Joyce McMullin, Mr. Eisom's grandmother, testified that they both telephoned Mr. Eisom at Ms. Miles's residence to tell him that Mr. McMullin had been killed. Fred P. Wells, II, testified that he had also telephoned Mr. Eisom at Ms. Miles's residence to inform him of the murders.

Qiandra Johnson, who lived near Mr. McMullin, testified that at approximately 10:00 or 10:30 p.m. on August 13, 2007, she was watching television when she saw "a fellow dressed in all black walking down the street . . . and he had like long dreads." She said that the man "walked down the street and behind the house next door to Mr. McMullin's house and just disappeared." She knew Mr. Eisom, and the man was not Mr. Eisom.

Xavier's mother, Shameil Johnson, testified that while she was reading the paper on August 14, 2007, Xavier pointed to a photograph of Mr. Robinson and ran away. When she caught up with Xavier he said, "He was there, too" and pointed at the photograph of Mr. Robinson. Xavier said that Mr. Robinson "was the guy that killed his dad."

Ms. Johnson said that Mr. Moses was waiting at her residence when she returned from the police station with Xavier and that he asked her if "everything was all right . . . and he said if I needed anything to let him know. He was trying to be a friend." He did not attempt to talk to Xavier.

Ms. Johnson's cousin, Tiffany Fields, said that Ms. Johnson and Xavier spent the night at Ms. Fields's house after they left the police station. On the following day, Mr. Robinson's photograph appeared in the newspaper, and Xavier refused to let anyone throw the paper away. Xavier pointed to the picture and told her that he had seen Mr. Robinson before. He did not say that Mr. Robinson had killed his father.

Crystal Richards, who had dated Mr. Robinson "five or six years" before the trial and who was a friend to Mr. McMullin, testified that during their relationship, Mr. Robinson "was very abusive" and, at one point, had "[h]eld a gun to [her] head." She testified that she and Mr. Robinson got into an altercation at a club and that on the following morning, "[she] woke up and he had a 9mm to the back of [her] head and told [her] he would kill [her] if [she] ever did that again." She said that Mr. Robinson was also abusive to her children and that he had held her hostage in her own home by nailing "2x4's up over the door." She said that he tried to force her to drink gasoline when she tried to leave him.

On the basis of this proof, the jury convicted Mr. Eisom of the first degree felony murder of Mr. McMullin, the first degree felony murder of Ms. Robinson, and the especially aggravated robbery of Mr. McMullin. The jury convicted Mr. Moses of the facilitation of the first degree felony murder of Mr. McMullin, the facilitation of the first degree felony murder of Ms. Robinson, and the especially aggravated robbery of Mr. McMullin. By operation of law, *see* T.C.A. § 39-13-208(c) (2006), Mr. Eisom received life sentences for both convictions of first degree felony murder. The trial court held a sentencing hearing to determine the sentences to be imposed for Mr. Eisom's conviction of especially aggravated robbery and to determine whether the three sentences should be served consecutively or concurrently. The trial court also conducted a sentencing hearing to determine the appropriate punishment for Mr. Moses.

At the joint sentencing hearing, the State presented proof that Mr. Eisom was on bond at the time of the offenses and that Mr. Moses was serving a community corrections sentence at the time of the offenses. Mr. Moses presented no proof. Mr. Eisom presented

no proof but elected to make a statement to the court. *See id.* § 40-35-210(b)(7). Mr. Eisom said,

> I guess this is the time for me to show remorse or beg for mercy or leniency. I will not – as for the guilty, I'm not guilty. For me and my loved ones is a time for solidarity and reflection. At the beginning of these proceedings, I asked for my rights to be protected, but they have been trampled in order to satisfy the victims' families and the prosecution. What about my family, my kids? What about Mr. Moses' family and his kids? I guess we have to be sacrificed in order to preserve Dyersburg's justice. We will appeal and give you these sentences back, because that's what the real law says. In order to find the real law, we have to go farther than Dyersburg. God bless all families involved. Thank you.

At the conclusion of the sentencing hearing, the trial court found Mr. Eisom to be a Range II offender, *see id.* § 40-35-106, a professional criminal, *see id.* § 40-35-115(b)(1), an offender whose record of criminal activity is extensive, *see id.* § 40-35-115(b)(2), and a dangerous offender, *see id.* § 40-35-115(b)(4). Based upon these findings, the trial court imposed a sentence of 40 years for the conviction of especially aggravated robbery and ordered that all three of Mr. Eisom's sentences be served consecutively. The court found Mr. Moses to be a Range I offender, *see id.* § 40-35-105, a professional criminal, an offender whose record of criminal activity is extensive, and a dangerous offender. The trial court imposed sentences of 25 years for each of Mr. Moses' convictions and ordered that the sentences be served concurrently for a total effective sentence of 25 years' incarceration.

Both Mr. Eisom and Mr. Moses filed timely motions for new trial, which were denied. They timely appealed to this court, and the cases were consolidated.

In this appeal, Mr. Eisom contends that the trial court erred by denying his request for a bill of particulars and that the trial court erred by refusing to permit him to present a "third party" defense. Both Mr. Eisom and Mr. Moses assert that the trial court erred by refusing to sever their trials and both contest the sufficiency of the convicting evidence. Finally, Mr. Moses asserts that his sentence is excessive based upon the dearth of proof of his guilt. We consider each claim in turn.

### I. Denial of Mr. Eisom's Motion for a Bill of Particulars

Prior to trial, Mr. Eisom moved the trial court to require the State to file a bill

-14-

of particulars. The trial court denied the motion, concluding that "the indictment is sufficient to inform the [d]efendant of the precise charges against him." Although the trial court conducted a hearing on Mr. Eisom's motion, the hearing transcript was not included in the record on appeal. In this appeal, Mr. Eisom contends only that the trial court erred by denying his motion but fails to specify how the denial of the motion hampered his defense. The issue is not supported by argument and contains only a single citation to Rule 7 of the Tennessee Rules of Criminal Procedure. Given the absence of the hearing transcript and Mr. Eisom's failure to support his claim with argument or citation to authorities, Mr. Eisom has waived our consideration of this issue. *See* Tenn. R. App. P. 24(b); Tenn. Ct. Crim. App. R. 10(b); *see also State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993).

## *II. Denial of Mr. Eisom's Attempt to Present a Third Party Defense*

Mr. Eisom complains that the trial court erroneously limited his questioning of witness Kathy Hendren about Ms. Robinson's fear of Mr. Robinson and that the erroneous limitation prevented him from establishing a "third party" defense. The State submits that the trial court properly precluded the proffered evidence because it was comprised of inadmissible hearsay. We agree with the State.

During the trial, Mr. Eisom presented the testimony of bail bonding agents Lillie Cooper and Kathy Hendren, both of whom testified that Ms. Robinson was present in city court on August 13, 2007, and that she appeared visibly shaken and upset. Mr. Eisom also sought to introduce through Ms. Hendren proof that Ms. Robinson told Ms. Hendren that Mr. Robinson would kill her he if he was released from jail that day. Mr. Eisom claimed that the statement was admissible via the hearsay exception in Tennessee Rule of Evidence 803(3). The trial court ruled that the statement was inadmissible hearsay because Mr. Eisom sought admission of the statement not to establish Ms. Robinson's fear of Mr. Robinson but Mr. Robinson's intent to harm Ms. Robinson.

Citing *State v. Kilburn*, 782 S.W.2d 199 (Tenn. Crim. App. 1989), and *State v. Spurlock*, 874 S.W.2d 602 (Tenn. Crim. App. 1993), Mr. Eisom contends that he should have been permitted to present Ms. Robinson's statement to Ms. Hendren as proof "that it was possible for her husband to be her killer."

A criminal defendant possesses the right to present evidence that someone other than the defendant committed the crime charged. *See State v. Carruthers*, 35 S.W.3d 516, 575 (Tenn. 2000) (citing *Green v. State*, 285 S.W. 554 (1926); *Sawyers v. State*, 83 Tenn. 694 (1885); *State v. Spurlock*, 874 S.W.2d 602, 612-13 (Tenn. Crim. App. 1993)). This right, however, is not without limitations. Evidence of third-party guilt "must conform to the general rules governing the admissibility of evidence," *see Carruthers*, 35 S.W.3d at

-15-

575 (citing *State v. McAlister*, 751 S.W.2d 436, 439 (Tenn. Crim. App. 1987)); *see also State v. Rogers*, 188 S.W.3d 593, 614 n.10 (Tenn. 2006) (holding that "admissibility is governed by all the Rules of Evidence, including the rule against hearsay"), and "[t]he evidence must be the type that would be admissible against the third party if he or she were on trial, and the proof must be limited to facts inconsistent with the [defendant's] guilt," *see id*. (citing *State v. Kilburn*, 782 S.W.2d 199, 204-05 (Tenn. Crim. App. 1989)). To determine whether the exclusion of evidence of third-party guilt rises to the level of the deprivation of the constitutional right to present a defense, a reviewing court must "consider whether: 1) the excluded evidence is critical to the defense; 2) the excluded evidence bears sufficient indicia of reliability; and 3) the interest supporting the exclusion is substantially important." *Rogers*, 188 S.W.3d at 614 (citing *State v. Powers*, 101 S.W.3d 383, 397 (Tenn. 2003); *Chambers v. Mississippi*, 410 U.S. 284 (1973)). We review the trial court's admission or exclusion of hearsay evidence under a de novo standard of review. *See State v. Gilley*, 297 S.W.3d 739, 759-61 (Tenn. Crim. App. 2008).

As indicated, Mr. Eisom sought admission via Ms. Hendren of Ms. Robinson's statement that Mr. Robinson would kill her when released from jail for the purpose of establishing Mr. Robinson's intent to harm Ms. Robinson. Acknowledging the hearsay nature of the statement, Mr. Eisom nevertheless argued that the statement was admissible via the hearsay exception contained in Tennessee Rule of Evidence 803(3). That rule provides:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

Tenn. R. Evid. 803(3). The advisory commission comments to the rule provide that "only the declarant's conduct, not some third party's conduct, is provable by this hearsay exception." *See id.*, Advisory Comm'n Comments. Mr. Eisom offered Ms. Hendren's account of Ms. Robinson's statement that Ms. Robinson believed Mr. Robinson would kill her not to prove Ms. Robinson's state of mind but rather as proof that Mr. Robinson intended to harm her. Such use of the statement, however, is expressly excluded by the rule. Additionally, even if the statement were offered to establish Ms. Robinson's state of mind on the day of her murder, the statement most certainly would not have been relevant to establish Mr. Robinson's culpability for the murders. Moreover, the exclusion of the statement did not rise to the level of a constitutional deprivation because the evidence was not critical to Mr. Eisom's defense. Mr. Eisom presented other proof that cast suspicion on Mr. Robinson, including Mr. Robinson's testimony under cross-examination that he had

thrice assaulted Ms. Robinson and had threatened her with bodily harm on the day of the murder. Because the evidence was inadmissible via the rules of evidence and because it was not critical to Mr. Eisom's defense, the trial court did not err by excluding it.

*III. Severance*

Both Mr. Eisom and Mr. Moses argue that the trial court erred by refusing to sever their trials from one another and by granting the State's motion to consolidate the proceedings. The State asserts that the defendants have waived our consideration of this issue by failing to include in the appellate record the transcript of the joint severance hearing. In the alternative, the State submits that consolidation of the two cases was appropriate.

Mr. Eisom contends that "[a]s a result of being tried jointly with . . . Mr. Moses, Mr. Eisom was deprived of his right to call said [c]o-[d]efendant as a witness in his behalf upon the [t]rial." Mr. Eisom has failed to include the transcript of the February 2, 2009 hearing on his motion to sever and has failed to support his assertion with argument, citation to authorities, or appropriate references to the record. Consequently, Mr. Eisom has waived our consideration of the issue. *See* Tenn. R. App. P. 24(b); Tenn. Ct. Crim. App. R. 10(b); *see also Ballard*, 855 S.W.2d at 560.

Mr. Moses claims that the trial court should have severed his trial from that of Mr. Eisom because "the evidence the State could produce against Cedric Moses would be substantially different in kind and character, and substantially less incriminating than the evidence that the State could produce against the [d]efendant Aubrey Tremaine Eisom." Like Mr. Eisom, Mr. Moses has failed to include in the appellate record the transcript of the hearing on his motion to sever the cases. Unlike Mr. Eisom, however, Mr. Moses has supported his claim with argument, citation to authorities, and appropriate references to the record. Included in the appellate record, and utilized by Mr. Moses in his argument, is the trial court's order denying severance and consolidating the cases for trial. Under these circumstances, we will not treat Mr. Moses' issue regarding severance as waived.

Rule 8 of the Tennessee Rules of Criminal Procedure provides that "[a]n indictment, presentment, or information may charge two or more defendants . . . if each of the defendants is charged with accountability for each offense included." Tenn. R. Crim. P. 8(c)(1). As is applicable in this case, however, Rule 14 of the Tennessee Rules of Criminal Procedure provides that "[o]n motion of the [S]tate or the defendant other than under Rule 14(c)(1), the court shall grant a severance of defendants if . . . before trial, the court finds a severance . . . appropriate to promote a fair determination of the guilt or innocence of one or more defendants." Tenn. R. Crim. P. 14(c)(2)(A). However, "[d]isparity in the evidence against the defendants is not alone sufficient to warrant the grant of a severance. *State v.*

-17-

*Howell*, 34 S.W.3d 484, 491 (Tenn. Crim. App. 2000) (citation omitted).

"The grant or denial of a motion for severance of defendants is a matter that rests within the sound discretion of the trial court, and [the reviewing court] will not disturb the trial court's ruling absent clear abuse of that discretion." *State v. Dotson*, 254 S.W.3d 378, 390 (Tenn. 2008) (citing *Hunter v. State*, 440 S.W.2d 1, 6 (Tenn. 1969); *State v. Burton*, 751 S.W.2d 440, 447 (Tenn. Crim. App. 1988)). "The test is whether or not the defendant was clearly prejudiced in his defense by being jointly tried with his co-defendant." *Howell*, 34 S.W.3d at 491 (citing *State v. Wiseman*, 643 S.W.2d 354 (Tenn. Crim. App. 1982)); *see also Dotson*, 254 S.W.3d at 390 ("The test to be applied . . . in determining whether the trial court abused its discretion is whether the [d]efendant was 'clearly prejudiced.'" (quoting *Hunter*, 440 S.W.2d at 6)). "The record must demonstrate that 'the defendant was clearly prejudiced to the point that the trial court's discretion ended and the granting of [a] severance became a judicial duty' before an accused is entitled to a reversal of his conviction." *Burton*, 751 S.W.2d at 447 (quoting *Hunter*, 440 S.W.2d at 6); *see also State v. Price*, 46 S.W.3d 785, 803 (Tenn. Crim. App. 2000).

In this case, Mr. Moses sought severance of his trial due to the disparity in proof of his involvement in the offenses versus the evidence of Mr. Eisom's involvement. Admittedly, the State produced more evidence tending to inculpate Mr. Eisom than it did to inculpate Mr. Moses; however, the State produced no evidence at the joint trial that was not relevant to the issue of Mr. Moses' guilt. Further, Mr. Armstrong identified Mr. Moses as a participant, albeit in the role of chauffeur, in the robbery of Mr. McMullin and as the getaway driver following the murders. The jury's finding Mr. Moses guilty only of the facilitation of the murders evinces some ability to parse the proof applicable to the defendants separately. Under these circumstances, we cannot say that the trial court abused its discretion by refusing to sever Mr. Moses' trial from Mr. Eisom's.

*IV. Sufficiency of the Evidence*

Both defendants challenge the sufficiency of the convicting evidence, primarily complaining that the State adduced insufficient evidence to corroborate Mr. Armstrong's testimony implicating them in the offenses. Both defendants point to the lack of physical evidence linking them to the crimes, and Mr. Moses points to the lack of any evidence, other than Mr. Armstrong's testimony, placing him at the scene of the crime. The State contends that sufficient evidence corroborates Mr. Armstrong's account of the offenses and that, taken as a whole, the proof supports the convictions of both defendants beyond a reasonable doubt.

We review the defendant's claim mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any

-18-

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *Winters*, 137 S.W.3d at 654. Although a criminal offense may be established exclusively by circumstantial evidence, *Duchac v. State*, 505 S.W.2d 237 (Tenn. 1973); *Winters*, 137 S.W.3d at 654, before an accused may be convicted of a criminal offense based upon circumstantial evidence alone, the facts and circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant." *State v. Crawford*, 470 S.W.2d 610, 612 (Tenn. 1971). "In other words, '[a] web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt.'" *State v. McAfee*, 737 S.W.2d 304, 306 (Tenn. Crim. App. 1987) (quoting *Crawford*, 470 S.W.2d at 613).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Winters*, 137 S.W.3d at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

It is well settled "that a conviction may not be based solely upon the uncorroborated testimony of an accomplice to the offense." *State v. Bane*, 57 S.W.3d 411, 419 (Tenn. 2001) (citing *State v. Stout*, 33 S.W.3d 531 (Tenn. 2001); *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994); *Monts v. State*, 379 S.W.2d 34, 43 (Tenn. 1964)). By way of explanation, our supreme court has stated:

> There must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged.

It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*Bane*, 57 S.W.3d at 419 (quoting *Bigbee*, 885 S.W.2d at 803); *see also State v. Fowler*, 373 S.W.2d 460, 463 (Tenn. 1963) (citations omitted).

In this case, there can be no doubt but that Mr. Armstrong was an accomplice in the especially aggravated robbery of Mr. McMullin and in the murders of Mr. McMullin and Ms. Robinson. The State concedes as much but argues that other evidence sufficiently corroborated Mr. Armstrong's recollection of the offenses. We will consider the evidence against each defendant separately.

Mr. Eisom was convicted of first degree felony murder in the deaths of Mr. McMullin and Ms. Robinson and the especially aggravated robbery of Mr. McMullin. First degree felony murder as charged in this case is the "killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery." *Id.* § 39-13-202(a)(2). "Especially aggravated robbery is robbery . . . (1) accomplished with a deadly weapon; and (2) where the victim suffers serious bodily injury." *Id.* § 39-13-403(a). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401.

With regard to Mr. Eisom, the proof adduced at trial, in addition to the thorough account of the crimes provided by Mr. Armstrong, established that Mr. Eisom and Mr. Armstrong walked Mr. Eisom's dogs during the evening hours of August 13, 2007. Ms. Wilson testified that Mr. Eisom later came to the residence that she shared with Mr. Armstrong and that the two men, along with a third unidentified individual, left together in a maroon Impala. When Mr. Armstrong returned to their home later that same evening, he told Ms. Wilson that Mr. Eisom had murdered the victims. Ms. Ford, Lieutenant Williams, and Tarmara McMullin each testified that Xavier said that "Gangsta" or "Uncle Gangsta" had murdered his father.[3] Several witnesses testified that Mr. Eisom's nickname was "Gangsta" and that Xavier referred to Mr. Eisom as "Uncle Gangsta." Xavier also told Lieutenant Williams that Mr. Eisom carried "a short gun" while "the other boy" carried an "oozie," which corroborates Mr. Armstrong's testimony that Mr. Eisom armed himself with a revolver while Mr. Armstrong was armed with a 9mm carbine. Xavier's statement to Ms.

---

[3]Although the testimony provided by Lieutenant Williams and Ms. McMullin in this regard would appear to be rank hearsay, Mr. Eisom did not object to its admission and agreed that the statements made to Lieutenant Williams and Ms. McMullin were "excited utterances." Because Mr. Eisom did not object to the admission of this testimony, Xavier's statements were admitted as substantive evidence of Mr. Eisom's guilt. *See State v. Smith*, 24 S.W.3d 274, 280 (Tenn. 2000).

Ford that the perpetrators demanded money corroborated Mr. Armstrong's testimony that the pair robbed Mr. McMullin. Although Mr. Eisom presented proof attempting to establish that he was at Ms. Miles's house caring for his infant daughter when the murders occurred, the jury, as was its prerogative, chose to reject this testimony. In our view, the evidence, when examined in the light most favorable to the State, was sufficient to support Mr. Eisom's convictions of first degree felony murder and especially aggravated robbery.

Mr. Moses was convicted of facilitation of first degree felony murder for the deaths of Mr. McMullin and Ms. Robinson and of the especially aggravated robbery of Mr. McMullin. "A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." *Id.* § 39-11-403(a). Again, first degree felony murder as charged in this case is the "killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery." *Id.* § 39-13-202(a)(2). "Especially aggravated robbery is robbery . . . (1) accomplished with a deadly weapon; and (2) where the victim suffers serious bodily injury." *Id.* § 39-13-403(a). Mr. Moses was convicted of especially aggravated robbery under a theory that he was criminally responsible for the conduct of Mr. Eisom and Mr. Armstrong. Code section 39-11-402 provides:

> A person is criminally responsible for an offense committed by the conduct of another, if . . . [a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense.

*Id.* § 39-11-402(2).

With regard to Mr. Moses, Mr. Armstrong testified that Mr. Moses drove him and Mr. Eisom to a location near Mr. McMullin's residence and dropped them off. He later picked them up after Mr. Eisom called him and told him to do so. Other evidence established that Mr. Moses drove a maroon Impala owned by Ms. McClain. Two witnesses saw Mr. Moses and Mr. Eisom together on the afternoon of August 13, 2007, several hours before the offenses. Ms. Wilson testified that Mr. Eisom arrived at the residence she shared with Mr. Armstrong in a maroon Impala similar to the one driven by Mr. Moses but she was unable to identify Mr. Moses as the driver of that vehicle. The maroon Impala driven by Mr. Moses was found parked near a dumpster outside an apartment building where Mr. Moses occasionally stayed with Ms. Yarbro on the morning following the offenses. Ms. Yarbro testified that Mr. Moses was not in the apartment when she returned from work sometime after 11:00 p.m. on August 13, 2007, and that he was not there when she awoke the following

morning. In the dumpster, officers found a box of ammunition, some of which contained bunter tool marks matching those bullets used to kill Mr. McMullin. Agent Royse could not say, however, that the ammunition used to kill the victims had come from the box recovered from the dumpster. There was no proof, even including Mr. Armstrong's testimony, that Mr. Moses participated in the planning of the robbery or that he knew that Mr. Eisom intended to murder the victims. Indeed, Mr. Armstrong testified that he was shocked when Mr. Eisom shot the victims and that Mr. Moses was unaware of the murders until Mr. Eisom told him in the car as they drove away.

Testimony that the defendants were seen together in the early afternoon hours of August 13, 2007, would not lead to an inference that the defendant participated in the crime, and, as such, it cannot be considered corroborative of Mr. Armstrong's testimony. The only proof tending to corroborate Mr. Armstrong's testimony that Mr. Moses drove him and Mr. Eisom to Mr. McMullin's residence and picked them up following the murders was Ms. Wilson's testimony that Mr. Eisom arrived at her residence by way of a maroon Impala similar to that driven by Mr. Moses and that the men left the residence by way of that same vehicle. Ms. Wilson was unable to identify Mr. Moses of the driver of that vehicle. This proof, "taken by itself," however, does not allow us to infer either that a crime was committed or that Mr. Moses was implicated in it. Furthermore, it does not actually include "some fact establishing the defendant's identity." Indeed, the evidence established that both Mr. Eisom and Mr. Moses had been given access to the maroon Impala by Ms. McClain and that both had driven the vehicle on occasion. In consequence, we cannot say that this testimony was sufficient to support Mr. Moses' convictions of facilitation of first degree felony murder and especially aggravated robbery. Accordingly, those convictions are reversed, and the case against Mr. Moses is dismissed.

## V. Sentencing

Finally, Mr. Moses contends that his 25-year effective sentence is excessive given the dearth of proof of his guilt. The State asserts that the sentence is appropriate. Although we have reversed and dismissed Mr. Moses' convictions, we will address his sentencing claim to facilitate any further review.

When considering challenges to the length and manner of service of a sentence this court conducts a de novo review with a presumption that the determinations of the trial court are correct. T.C.A. § 40-35-401(d) (2006). This presumption, however, "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). The appealing party, in this case the defendant, bears the burden of establishing impropriety in the sentence. T.C.A. § 40-35-401, Sentencing Comm'n

-22-

Comments; *see also Ashby*, 823 S.W.2d at 169. If our review of the sentence establishes that the trial court gave "due consideration and proper weight to the factors and principles which are relevant to sentencing under the Act, and that the trial court's findings of fact . . . are adequately supported in the record, then we may not disturb the sentence even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). In the event the record fails to demonstrate the required consideration by the trial court, appellate review of the sentence is purely de novo. *Ashby*, 823 S.W.2d at 169.

> In making its sentencing decision, the trial court must consider:
>
> (1) The evidence, if any, received at the trial and the sentencing hearing;
> (2) The presentence report;
> (3) The principles of sentencing and arguments as to sentencing alternatives;
> (4) The nature and characteristics of the criminal conduct involved;
> (5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
> (6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
> (7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b). The trial court should also consider "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." *Id.* § 40-35-103(5).

Mr. Moses does not make any specific claim of error with regard to his sentence but instead asks this court to "review his sentence especially in regard to his total lack of involvement in the alleged offenses." The record establishes that the trial court considered all relevant sentencing principles and applied appropriate enhancement factors to Mr. Moses' sentence. The trial court further considered proof of Mr. Moses' lesser role in the offenses, imposing concurrent sentences in his case while imposing consecutive sentences in Mr. Eisom's case. Mr. Moses is not entitled to relief from his sentence.

*Conclusion*

Mr. Eisom waived our consideration of his claims regarding the trial court's failure to require the State to file a bill of particulars and the trial court's failure to sever his trial from that of Mr. Moses. The evidence was sufficient to support Mr. Eisom's convictions. The trial court did not err by failing to sever Mr. Moses' trial from Mr. Eisom's, but the evidence presented by the State was insufficient to corroborate the testimony of Mr. Armstrong implicating Mr. Moses in the offenses. Mr. Moses' sentence, however, was appropriate. Accordingly, the judgments of the trial court in Mr. Eisom's case are affirmed. The judgments of the trial court in Mr. Moses' case are reversed, and the case is dismissed.

_____

JAMES CURWOOD WITT, JR., JUDGE